IN RE: INQUIRY CONCERNING A JUDGE, No. 76, CHARLES T. KIVETT, RESPONDENT

No. 417A83

(Filed 6 December 1983)

1. **Appeal and Error § 10.1— motion to include materials in record on appeal—denial by Supreme Court**

    In this appeal of a judicial disciplinary proceeding, respondent judge's motion under Appellate Rule 37 to include as part of the record on appeal certain paperwritings previously furnished to the Judicial Standards Commission by respondent is denied by the Supreme Court where such materials were not considered by the Commission in arriving at its recommendation and are not necessary or helpful to the Supreme Court's decision.

2. **Judges § 7— judicial disciplinary proceeding—effect of judge's resignation**

    The Supreme Court was not deprived of jurisdiction over a proceeding to remove a superior court judge by the judge's letter of resignation which was to take effect after the case was argued in the Supreme Court. Nor was the proceeding rendered moot by such resignation.

3. **Judges § 7— judicial disciplinary proceeding—quantum of proof**

    The quantum of proof required to sustain findings by the Judicial Standards Commission is proof by clear and convincing evidence.

4. **Judges § 7— judicial disciplinary proceeding—duty of Supreme Court**

    The Supreme Court is not bound by the recommendations of the Judicial Standards Commission but may consider all of the evidence and exercise its independent judgment as to whether it should censure, remand, or dismiss the proceedings against a respondent judge.

5. **Judges § 7— conduct prejudicial to administration of justice—censure of superior court judge**

    A superior court judge is censured by the Supreme Court for conduct prejudicial to the administration of justice that brings the judicial office into disrepute on the basis of the following findings: (1) respondent established an unethical relationship with a bail bondsman and as a result thereof permitted the bondsman to communicate with him regarding pending criminal cases in which the bondsman had an interest or over which the respondent presided or both; (2) during lunch at a public restaurant, respondent made sexual advances toward a female probation officer against her will and over her protests by repeatedly placing his leg against her leg and then by placing his leg between her legs.

6. **Judges § 7— willful misconduct in office—removal of superior court judge**

    The following conduct of a superior court judge constituted acts of willful misconduct in office which warranted his removal from office by the Supreme Court: (1) the judge telephoned the district attorney on behalf of a friend who had been charged with rape and attempted to discuss the pending rape charge

In re Kivett

with the district attorney; (2) the judge signed an order eliminating "consent to search" and "house arrest" conditions of a probation judgment without notice to the district attorney, defendant's probation officer or to his original attorney and at a time when the judge was not assigned to hold court in the county; (3) the judge suggested to an assistant district attorney that he "help" a female defendant with respect to a driving under the influence charge, the assistant district attorney agreed to permit the defendant to plead guilty to the reduced charge of careless and reckless driving, and respondent presided over the defendant's trial, accepted her guilty plea and gave her a suspended sentence at a time when he recognized her as a woman with whom he had had sex within two years prior to the trial; and (4) the judge attempted to prohibit the convening of a grand jury which was to consider an indictment against him by telephoning another superior court judge and asking such judge to issue a restraining order to prevent the grand jury from convening.

**7. Judges § 7— judicial disciplinary proceeding—compliance with notice requirements**

The Judicial Standards Commission complied with the notice requirements of J.S.C. Rule 7 and due process where the notice sent to respondent judge fully informed him of the nature of the charges being investigated, specifically set forth eight events or transactions involved, and advised him of his right to submit materials to the Commission for consideration during the investigation.

**8. Judges § 7— Judicial Standards Commission—investigative and judicial functions—due process**

The combination of investigative and judicial functions within the Judicial Standards Commission did not violate respondent judge's due process rights.

**9. Judges § 7— judicial disciplinary proceeding—character or credibility of respondent—absence of findings**

The Judicial Standards Commission was not required to make findings concerning respondent judge's character or credibility.

**10. Judges § 7— judicial disciplinary proceeding—no violation of ex post facto doctrine**

A judicial disciplinary proceeding was not barred by the ex post facto doctrine because some of the conduct complained of occurred prior to the creation of the Judicial Standards Commission on 1 January 1973 since (1) all of the acts of respondent judge constituted grounds for removal at the time they were committed and the ex post facto doctrine did not prohibit the Commission from considering evidence of conduct by a judge which would constitute grounds for impeachment prior to 1 January 1973, and (2) the ex post facto doctrine applies only to criminal prosecutions, and judicial disciplinary proceedings are not criminal actions.

**11. Judges § 7— judicial disciplinary proceeding—effect of reelection of judge**

The reelection of a superior court judge after the conduct complained of did not bar a proceeding before the Judicial Standards Commission based on such conduct.

Justice Exum did not participate in the consideration or decision of this proceeding.

THIS proceeding is before the Court upon the recommendation of the Judicial Standards Commission (Commission) that Charles T. Kivett (respondent), a judge of the General Court of Justice, Superior Court Division, Eighteenth Judicial District, be removed from office as provided in N.C.G.S. 7A-376. The recommendation was filed in the Supreme Court on 2 August 1983. Heard in the Supreme Court 10 November 1983.

On 4 October 1982, the Judicial Standards Commission, in accordance with its Rule 7 (J.S.C. Rule 7), 283 N.C. 763 (1973), notified respondent that it had ordered a preliminary investigation to determine whether formal proceedings under J.S.C. Rule 8 should be instituted against him. The notice informed respondent of the specific areas of misconduct to be investigated, that the investigation, reports, and any proceedings before the Commission would remain confidential pursuant to J.S.C. Rule 4 and N.C.G.S. 7A-377, and that respondent had the right to present for the Commission's consideration relevant matters as he might choose. Respondent from time to time during the investigative stage did present materials to the Commission for its consideration.

On 17 February 1983, respondent was served with a formal complaint and notice by the Commission. The notice informed respondent that formal proceedings should be instituted against him, that Howard E. Manning had been appointed Special Counsel for the formal proceedings, and that the charges were (a) willful misconduct in office and (b) conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Respondent was also informed that the alleged facts upon which the charges were based are specifically set out in the verified complaint attached to the notice and that respondent had the right to file a written verified answer within twenty days.

The complaint, in summary, alleged the following:

*Count I.* That between 24 January 1973 and 9 April 1973, respondent telephoned Herman W. "Butch" Zimmerman, Jr., Solicitor of the Twenty-Second Prosecutorial District, at the request of Gurney T. Johnson, for the purpose of using his position as a Superior Court Judge to influence Solicitor Zimmerman not

to prosecute Johnson on a charge of rape of one Cathy Elizabeth Lovette, alleged to have occurred on 24 January 1973.

*Count II.* That as a result of sexual relations with Miriam Eller, respondent granted lenient treatment of her son, Jimmy Crysel, who was before respondent on various traffic charges that occurred while Crysel was on probation.

*Count III.* While holding court in Surry County and during a lunch recess of that court, respondent had sexual relations with a female in the judge's chambers of the courthouse.

*Count IV.* That respondent allowed his judicial decisions to be influenced by the requests of G. T. Johnson because of the special relationship that had developed between respondent and Johnson. Over a period of several years, respondent established a relationship with Johnson in which Johnson procured females for respondent for the purpose of sexual activities, allowing respondent to use his lake cabin without expense, and resulted in Johnson gaining influence with respondent in respect to his judicial decisions. Specific instances of judicial acts influenced by Johnson are set forth.

*Count V.* Respondent requested an assistant district attorney to reduce a charge of DUI against Carol Bryson Pruitt in a case pending before respondent. Prior to this charge being brought against her, respondent had been sexually involved with Ms. Pruitt, and respondent interceded on her behalf for this reason. A plea to a lesser offense was entered before respondent.

*Count VI.* Respondent sexually assaulted a female probation officer by improperly touching her.

*Count VII.* This count was withdrawn.

*Count VIII.* On 17 December 1982, respondent telephoned Superior Court Judge Douglas Albright and solicited him to enter an order restraining the convening of the Guilford County Grand Jury. Respondent was fearful that a bill of indictment against him would be submitted to the grand jury.

Respondent filed an answer on 8 March 1983 denying the allegations of the complaint and setting up detailed explanations of his conduct with respect to each of the counts. He also alleged various defenses to the charges.

On 7 April 1983, a notice of formal hearing, to be held commencing 21 June 1983, was served upon respondent. Various discovery proceedings were carried out prior to the commencement of the formal hearing. At the hearing, respondent was present and represented by his counsel of record. Howard E. Manning appeared as Special Counsel for the Judicial Standards Commission. Evidence necessary for an understanding of the parties' contentions will be hereinafter set forth.

On 2 August 1983, after reciting the chronology of events and procedural findings prior to the formal hearing, the Commission in its order of recommendation made findings of fact and conclusions of law as follows:

9. At the hearing evidence was presented by Special Counsel for the Commission and by Counsel for the respondent, and having heard the evidence presented and having observed the demeanor and determined the credibility of the witnesses, the Commission found the following facts on clear and convincing evidence:

(a) Between 24 January 1973, the date on which Gurney T. Johnson allegedly raped Kathy Elizabeth Lovette at his lake house in Alexander County, North Carolina, and 9 April 1973, the date on which H. W. "Butch" Zimmerman, Jr., District Attorney for the Twenty-Second Judicial District, presented a bill of indictment for rape in the case of *STATE OF NORTH CAROLINA v GURNEY T. JOHNSON*, Alexander County file number 73CR952, the respondent telephoned district attorney Zimmerman at home on behalf and for the benefit of Gurney T. Johnson, a friend of the respondent. During this telephone conversation, the respondent attempted to discuss the rape charge then pending against Johnson, knowing that Zimmerman would be responsible for prosecution of the case, but Zimmerman terminated the conversation soon after it began because he considered it improper.

(b) Beginning in 1972 and continuing until January of 1982, the respondent established an unethical relationship with Gurney T. Johnson who was at the initiation and continued to be for a substantial portion of this relationship a bail bondsman serving Wilkes County and surrounding coun-

ties located in judicial districts wherein the respondent was regularly assigned to hold criminal sessions of court.

During the course of this relationship, Johnson made his lake house in Alexander County near Taylorsville, North Carolina, available to the respondent for use free of charge, and the respondent used it for illicit sexual activities on at least two occasions, one of which Johnson had knowledge. In addition, the respondent visited Johnson in his home, at his used car lot, at his bonding business office across from the courthouse in Wilkesboro, North Carolina, and as recently as 8 January 1982 at his farm office adjacent to his home; the respondent saw and spoke to Johnson at different courthouses where the respondent was holding court, ate meals with Johnson, and met Johnson in Winston-Salem, North Carolina, on at least two occasions.

As a result of this relationship, the respondent allowed Gurney T. Johnson to communicate with him regarding pending criminal cases in which Johnson had an interest or over which the respondent presided or both.

(c) Furthermore, during the 8 March 1976 Criminal Session of Alexander County Superior Court over which the respondent presided, the defendant in STATE OF NORTH CAROLINA v VONTENIA ROBINETTE, Alexander County file number 75CR1112, pleaded guilty to felonious sale of marijuana. The respondent accepted the defendant's plea and entered a probationary judgment against the defendant which included special conditions relating to the consent search of defendant's person, place, or vehicle by law enforcement or probation officers and to the house arrest of the defendant for six months. Prior to 28 April 1976, Gurney T. Johnson communicated with the respondent about changing this probationary judgment, and the respondent modified the probationary judgment on 28 April 1976 by ordering that the special conditions relating to consent search and house arrest be stricken from the judgment. Having already discussed the matter with Johnson, the respondent entered this order at the request of John Hall, attorney for defendant Robinette, made *ex parte* out of court, and the respondent entered this order without consulting or notifying H. W. "Butch" Zimmer-

man, Jr., District Attorney for the Twenty-Second Judicial District, or Sam Boyd, the defendant's supervising probation officer.

(d) On 17 December 1971 which was the last day of the last two-week criminal session of Forsyth County Superior Court over which the respondent presided from that date through 1 July 1972, the defendant in *STATE OF NORTH CAROLINA v CAROL BRYSON PRUITT*, Forsyth County file number 71CR35584, appeared before the respondent on appeal from her 22 November 1971 conviction in district court on charges of driving under the influence of intoxicating liquor and pleaded guilty to careless and reckless driving. Prior to 17 December 1971, the respondent had spoken to James C. Yeatts, the assistant district attorney who prosecuted the *PRUITT* case before the respondent, about the case, described the defendant as a friend or a friend of a friend, and asked Yeatts to look into the case and help with the case. As a result of the respondent's request and information he was able to learn about the case, assistant district attorney Yeatts determined he would agree to allow the defendant to plead guilty to the reduced charge of careless and reckless driving. The respondent presided over the defendant's trial, accepted her guilty plea, and gave her a suspended sentence. At the time the respondent sentenced Pruitt, he recognized her as a woman with whom he had had sex within two years prior to the trial and who had attempted to speak with him at a restaurant at lunch time about three weeks prior to the trial, but at no time did the respondent inform assistant district attorney Yeatts of his earlier sexual relationship with the defendant.

(e) During a noon recess of a session of Rowan County Superior Court over which the respondent was presiding in late 1969 or early 1970, the respondent went to lunch with Peggy King, a probation officer serving Rowan and seven other counties located in judicial districts in which the respondent was assigned to hold court. During lunch at a public restaurant, the respondent made sexual advances toward Peggy King without her consent and against her will by repeatedly placing his leg against her leg. Peggy King told him to stop, but he persisted and placed his leg around her

leg and between her legs whereupon she struck him in the shoulder with her fist.

(f) On Friday, 17 December 1982, the respondent telephoned W. Douglas Albright, Superior Court Judge for the Eighteenth Judicial District, at home. The respondent related to Judge Albright that he believed Michael Schlosser, then District Attorney for the Eighteenth Judicial District, was going to present a bill of indictment against the respondent before the grand jury of Guilford County to be convened on Monday, 20 December 1982, and the respondent solicited Judge Albright to enter a restraining order to prevent the grand jury from convening. Judge Albright expressed the belief that any action by him to restrain the grand jury from convening at the request of the respondent who would be the subject of such proceedings could be viewed as obstruction of justice, and he declined to issue such an order. When Judge Albright refused to enter the restraining order, the respondent abruptly terminated the conversation. Judge Albright promptly telephoned Franklin Freeman, Administrative Officer of the Courts, and notified him of the respondent's improper solicitation.

10. The findings hereinbefore stated and the conclusion of law and recommendation which follow were concurred in by five (5) or more members of the Commission.

### CONCLUSIONS OF LAW

11. As to the facts set forth in paragraphs 9(b) and 9(e), the Commission concludes on the basis of clear and convincing evidence that the actions of the respondent constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute and his actions violate Canons 1 and 2 of the North Carolina Code of Judicial Conduct.

12. As to the facts set forth in paragraphs 9(a), (c), (d), and (f), the Commission concludes on the basis of clear and convincing evidence that the actions of the respondent constitute willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute and his actions violate Canons 1, 2, 3A(4), and 3C(1) of the North Carolina Code of Judicial Conduct.

RECOMMENDATION

13. The Commission recommends on the basis of findings of fact in paragraphs 9(a) through 9(f) and the conclusions of law relating thereto that the Supreme Court remove the respondent from judicial office.

By order of the Commission, this the 2nd day of August, 1983.

> s/Gerald Arnold
> Gerald Arnold
> Chairman
> Judicial Standards Commission

Thereafter, respondent timely requested a hearing before this Court on the Commission's recommendations.

*Howard E. Manning, Special Counsel, for the Judicial Standards Commission.*

*Cahoon and Swisher, by Robert S. Cahoon; C. Richard Tate, Jr.; and Smith, Patterson, Follin, Curtis, James and Harkavy, by Norman B. Smith, for respondent.*

MARTIN, Justice.

[1] At the outset, we are faced with respondent's motion to include as a part of the record on appeal certain paperwritings previously furnished to the Judicial Standards Commission by respondent. A copy of this material, entitled "Judge Charles T. Kivett, Investigative Information, Sections I-X," comprising two volumes, has been filed with this Court. This material was submitted to the Judicial Standards Commission, pursuant to JSC Rule 7(b), on 4 January 1983, except Section X, which was submitted 27 January 1983. Rule 7(b) allows a respondent to submit relevant matters to the Commission for its consideration in determining whether a formal complaint should be issued.

The material which respondent now seeks to have made a part of the record was not introduced as evidence in the formal hearing. It was not a part of the evidence upon which the Commission based its recommendation. However, the substance of some of this material was before the Commission through other

witnesses; e.g., evidence of alleged efforts by agents of the SBI to influence the testimony of Millie Dyonia Vernon through offers to help her regain her driver's license which had been suspended. Much of this material consists of affidavits by attorneys and court personnel as to respondent's good character and reputation as a judge. Approximately twenty-three affidavits are to this effect. Three affidavits are by attorneys who represented respondent during these proceedings. Affidavits by respondent, as well as an unsigned paper, purportedly a statement by respondent, were included, along with copies of court orders and judgments. Most, if not all, of the court orders and judgments were in evidence at the formal hearing.

There is nothing in the record suggesting that these persons could not have been available to testify at the hearing. At least one such person, attorney John E. Hall, was so present but was not called by respondent to testify. Some of the material is incompetent as evidence; e.g., the unsigned paper, purportedly a statement by respondent.

If these materials are allowed to become a part of the record at this late stage of the proceedings, fairness would require that evidence be allowed to rebut them. We do not find that the tendered materials are necessary or even helpful to our decision in this proceeding. The materials were not considered by the Commission in arriving at its recommendation. Certainly, respondent is not prejudiced by the absence of the materials. Respondent's motion, made pursuant to Rule 37 of the North Carolina Rules of Appellate Procedure, is addressed to our discretion. The motion is denied.

[2] At the call of this proceeding for oral argument, one of respondent's counsel informed the Court that respondent had, by letter dated 9 November 1983, submitted to Governor James B. Hunt, Jr., his resignation as a superior court judge. The resignation is to become effective 31 December 1983. Assuming that the resignation has been or will be accepted by the governor, it does not deprive this Court of its jurisdiction over this proceeding. *In re Peoples*, 296 N.C. 109, 250 S.E. 2d 890 (1978), *cert. denied*, 442 U.S. 929 (1979). "When a resignation specifies the time at which it will take effect, the resignation is not complete until that date arrives." *Id.* at 145, 250 S.E. 2d at 911. Nor is the case rendered moot by the resignation. *Id.*

We now consider whether the evidence before the Commission with reference to respondent's conduct supports the findings of fact and conclusions of law made by the Commission. After so doing, we must determine whether such conduct constitutes willful misconduct in office, conduct prejudicial to the administration of justice bringing the judicial office into disrepute, or both, and, if so, whether respondent should be removed from office or censured.

[3] First we address the sufficiency of the evidence to support the findings of fact. The quantum of proof required to sustain the findings of the Commission is by clear and convincing evidence. *In re Nowell*, 293 N.C. 235, 237 S.E. 2d 246 (1977).

Initially, we review the evidence offered to support *finding of fact 9(b)* (quoted above) because that evidence paints the background of the proceeding. This evidence showed in summary:

Gurney T. Johnson testified that he ran a used car business for over twenty years. Approximately eighteen years ago, Johnson entered the bail bonding business. He testified that he was engaged in that business until approximately 1979. He wrote bonds in Wilkes and surrounding counties. He was operating his bonding business when the respondent first met him. The respondent admitted that he was aware of that fact when they first met. The respondent testified that he held court in that district and in those counties.

Johnson testified that he made his lake house near Taylorsville available to the respondent free of charge. Likewise, Johnson testified that he made his bonding office apartment located in the rock house available to the respondent free of charge. Johnson further testified that he supplied the respondent with gifts at Christmas and Thanksgiving or a bottle of whiskey at a party and that he kept the lake house well stocked. Johnson testified that the first week of their relationship he and the respondent took some girls to the lake house. That pattern continued during the relationship. In fact, the respondent admitted using Johnson's lake house, on at least two occasions, as a location in which he engaged in illicit sexual relations. On one occasion this was with Ruth Byrd and on another occasion with Wanda Anderson. Respondent's testimony concerning these two

women at the lake house explicitly corroborated the testimony of G. T. Johnson who earlier testified about Byrd and Anderson as well as other women.

The respondent also admitted that he visited G. T. Johnson at his home, at his used car lot, at his bonding business office across from the courthouse, and as recently as 8 January 1982, at his farm. Johnson testified that the respondent visited him at his home, at his car lot, at his bonding business, and at his farm on 8 January. Robert Parker testified that he observed the respondent at Johnson's car lot on several occasions. Former trooper T. P. Reavis testified that he saw the respondent at Johnson's car lot on a couple of occasions and had a conversation on one occasion with the respondent concerning Miriam Eller. Furthermore, the respondent testified that he saw and spoke to Johnson at different courthouses where he was holding court, that he ate meals with Johnson and socialized with him, and that he met Johnson in Winston-Salem on at least two occasions. Johnson had testified that he met with the respondent, and went out looking for female companionship, in several counties other than Wilkes, including the cities of Charlotte and Winston-Salem. They visited the "Tiki," a topless bar in Winston-Salem.

From the first week of their relationship, Johnson procured women for respondent and that continued throughout. Johnson testified that "a lot of times I'd line them up and a lot of times we'd go to a bar or a dance." On many of those occasions, these rendezvous occurred at the lake house. Johnson described the activities that would often occur as cooking, having a few drinks, dancing, and sex. Johnson testified: "A few times we'd—maybe he'd take one to a bedroom and I'd take one to a bedroom."

The relationship was a close one between men from obviously different ·stations in life. As Johnson explained: "[E]verybody wanted to know what our relation was, me being a farmer and a country boy and into different things and he being a judge, why we were so close; and everybody knew there was something." Johnson explained why they were so close: "[W]e had something in common about women; we were both running around with women and we partied, and that was the truth about it."

Their relationship was so exceedingly close that the respondent would often relate to Johnson the details of his activities with

women. Johnson testified: "A lot of times we would comment, a lot of times . . . a lot of times he'd tell me that he had sex." The respondent related his activities with Wanda Anderson, as Johnson testified: "He just told me the way he had sex with her. He said she was an unusual person." The respondent related to Johnson his activities with Miriam Eller, the mother of Jimmy Crysel. Johnson testified: "Yes, sir, he told me he had sex with her that first time in my apartment up there . . . he's told me he had sex with her after that." The respondent had borrowed the key for the bonding office from Johnson, and he related his activity with Mrs. Eller to Johnson upon returning the key. Johnson testified that on one occasion the respondent related that he had engaged in sex with a lady juror in chambers in Dobson and that a chief deputy or deputy had guarded the door. He testified that the respondent named the deputy as the present Sheriff of Surry County, Bill Hall. The respondent denied having sex with either woman.

These frank admissions to G. T. Johnson by the respondent and their activities together, as noted above, demonstrate the close nature of the relationship that existed between these men. To give another example, Johnson testified that the respondent related an affair that he engaged in with Ruth Byrd. Johnson stated that the respondent told him he met Ruth Byrd in Ashe County where she worked in the Register of Deeds office and that she ultimately moved to Winston-Salem where the respondent continued to see her for a couple of years. He stated that the respondent had agreed to see her at least once a week. Johnson further testified that he saw Ruth Byrd at his lake house where she was staying with the respondent while he was holding court in Wilkes County. He related that the furnace in the house had run out of oil and that the respondent had asked him to attend to it. He further testified that the respondent informed him that after he and Ruth Byrd broke up, her brother was upset and the respondent informed him that he was going to change terms of court with another judge.

Respondent admitted having an affair with Ruth Byrd and engaging in sexual relations with Ruth Byrd at Johnson's lake house on at least one occasion. He further admitted on cross-examination that she moved to Winston-Salem and that for a while he saw her as frequently as once a week. Furthermore, he

testified that he was assigned to Ashe County during 1977 to hold court and that the relationship had terminated prior to that time. The discussion of sensitive personal matters of this sort were not one-sided. The respondent testified that Johnson took him to meet Wanda Byrd at her house. Johnson told the respondent that he had a second family with Wanda Byrd. Wanda Byrd was also present, by Wanda Anderson's testimony, at the lake house when Mrs. Anderson met the respondent.

The respondent allowed Gurney T. Johnson to communicate with him concerning pending criminal cases in which Johnson had an interest or over which the respondent presided or both. The first manifestation of this part of the relationship concerned a speeding ticket which the respondent received from a highway patrolman. Johnson testified that respondent came to court one morning after spending the night at Johnson's lake house and gave Johnson a copy of a speeding ticket written by Trooper Meeker. Johnson testified that he spoke with Solicitor Allie Hayes about it. Ultimately the charge was dismissed.

Johnson related that the respondent obtained the key for the bonding office apartment on one day and returned it to him the next day after stating that he used the rock building for sexual relations with Miriam Eller. Johnson testified that during that week he observed Mrs. Eller in court with her son, Jimmy Crysel, who was in court for a probation violation. During court, Johnson observed Mrs. Eller approach the bench and talk with the respondent. Thereafter, he observed the respondent in the company of Mrs. Eller and on one occasion he and the respondent went to her place of employment, Ithaca Hosiery, looking for her. On one occasion, Johnson testified that the respondent pointed out her house to him.

The court records contained in Commission Exhibit I indicate that in 1971 Crysel was arrested for drug violations. He was put on supervised probation in February of 1972 by Judge Gambill. On 15 June 1972, he was cited by his probation officer for a violation. That matter came on for hearing before the respondent on 8 August 1972, but was continued by respondent until 2 October 1972. On 2 October 1972, the matter came on for hearing before the respondent, who continued him on probation under the same conditions. On 24 October 1972, Crysel was arrested by a state

trooper after a chase in excess of one hundred miles per hour and for failing to stop for a siren. He was tried in district court, found guilty, and given a six-month active sentence on 30 November 1972. Thereafter, within a week, this case was written on the superior court calendar for disposition before the respondent, who placed the defendant on unsupervised probation. Commission Exhibit I-F showed that this term of court was respondent's last in Wilkes County and that he was not assigned to hold court in Wilkes County in 1973.

The respondent denied having sexual relations with, or even being acquainted with, Miriam Eller. Miriam Eller also denied sexual relations or any sort of relationship with the respondent.

The respondent, in his answer under oath, denied that Jimmy Crysel appeared before him on 2 October 1972 or that he ever continued Crysel on probation. The Commission heard the testimony of Rex B. Yates, Crysel's probation officer, who testified that he cited Crysel into court for violations before respondent. Yates recalled on the day it was heard that he presented his report to respondent and the court heard the report. He further testified that he recalled Mrs. Eller being in court that day and that he remembered her as a "very attractive lady." During a pause in the proceedings, Yates testified that the respondent called G. T. Johnson to the bench, and immediately thereafter the respondent instructed Yates to report back the following morning. Yates testified that the following morning Crysel was continued on probation by respondent with no new instructions, conditions, or reprimand.

Respondent allowed Johnson to improperly communicate with him regarding pending criminal cases over which the respondent presided. On several of these cases Johnson was paid by the defendant to use his influence in an attempt to receive a lighter sentence. In some cases, Johnson did not charge the defendant anything because of prior or longstanding friendship. An example of this latter category is the case of Gates Jordan.

Johnson testified that he had occasion to bump into Jordan when he was in court in Statesville. Jordan advised that he was charged with DUI and asked Johnson if he knew respondent, who was presiding. Jordan asked if Johnson would say a good word to the respondent, and Johnson stated that he would. Johnson said

he went in to see the respondent and advised him that Jordan was a real good friend and that he had a case pending. Johnson advised that Jordan's daughter was Judge Collier's secretary and if there was anything he could do to help him that he, Johnson, would appreciate it. The respondent said that he would do what he could. Commission Exhibit V shows that Jordan was charged with DUI 28 December 1975 and that the matter was heard in district court on 10 February 1976 where Jordan was found guilty and sentenced to six months suspended and to surrender his license for one year. The matter was heard before respondent on 27 May 1976, and the verdict was guilty and the sentence was four months suspended and surrender license. The case was appealed to the Court of Appeals, which affirmed on 26 April 1977. On 4 May 1977, respondent allowed Jordan a limited driving privilege which permitted him to drive to Winston-Salem and Charlotte.

James "Dickie" Pardue was charged with possession of more than fifty pounds of marijuana in Wilkes County. Johnson testified that he had gone to school with Pardue and that they were neighbors. He stated that soon after Pardue was charged with the possession of fifty pounds of homegrown marijuana in his basement, Pardue came to see him. Pardue asked Johnson for assistance and ultimately paid him five hundred dollars. On Pardue's behalf, Johnson approached respondent and advised him that Pardue had gone to school with him and that he was "a real good boy." He further advised the respondent that he would really appreciate it if the respondent would put Pardue on probation. The respondent agreed. Johnson advised that one of his used car employees and a part-time magistrate was available as a character witness. The respondent advised Johnson to arrange that, and the employee did testify on Pardue's behalf. That evening the respondent advised that he "took care of Dickie or my boy or whatever." Commission Exhibit VI shows that Pardue was indicted on 26 September 1977 for possession with intent to sell and deliver fifty pounds of marijuana and with manufacture of marijuana. This marijuana was seized pursuant to a search conducted of Pardue's residence. Pardue pleaded guilty to possession of fifty pounds of marijuana before the respondent, with the only plea bargain being the dismissal of the manufacturing charge. The respondent placed the defendant on probation.

It was through James "Dickie" Pardue that Johnson first met Charlie Reid Vaden. Johnson testified that Vaden was related to Pardue by marriage and that Pardue brought him to see Johnson. Vaden advised Johnson that he had received an eighteen-month active sentence in Yadkin County District Court for shooting up a car and he desired Johnson's assistance. Johnson advised him to engage John Hall as his attorney. When the case came up for trial in Yadkin County, Johnson went to court and spoke with the respondent. He advised the respondent that he had a friend who had received an eighteen-month sentence and that he, Johnson, would like for him to help Vaden. Johnson also advised the respondent that Vaden had a codefendant named Young. The respondent asked Johnson who the lawyer was, and Johnson advised him it was John Hall. Respondent advised that "he'd take care of it or try to help." Immediately after talking with the respondent, Johnson saw Vaden and Young and told them that everything would be all right. Johnson testified that he later learned that the case was dismissed on the search warrant. Johnson testified he was paid twelve hundred dollars for his assistance in this matter.

Commission Exhibit VII shows that on 23 September 1977, Reid Vaden and Gregory Young were arrested as a result of shooting out four automobile windowshields at William Anderson's car lot. A search warrant was obtained from Magistrate Motley by Deputy Dennis Poplin which resulted in the seizure of a pistol from the vehicle in which Vaden and Young were apprehended shortly after the shooting incident. William Anderson, the owner of the damaged vehicles, testified that he lived directly across from his place of business and was awakened by the sound of gunfire on 23 September 1977. Anderson observed the Volkswagen vehicle pass by and observed the damage. He reported what he had observed to law enforcement officers. Later that evening, he appeared before Magistrate Motley and testified as to what he observed. He testified in district court in Yadkin County but was not notified as to any other disposition.

Ultimately this matter came up in Yadkin County before the respondent and was heard in Wilkes County. An order was signed by respondent, prepared on John Hall's stationery, which suppressed evidence obtained by the search. As a basis for the suppression, the order finds insufficient basis in the search warrant

to find that the informant was reliable. District Attorney Mike Ashburn testified that the court file was not in Wilkes County when the matter was heard. The first notice that the district attorney had that the evidence had been suppressed came when Mr. Ashburn was routinely pulling the files in calendaring the cases for trial; it was then that this order was discovered. This occurred after respondent had left the district. The order was discovered in March; it had been signed on 2 December and filed on 4 January 1978.

Vaden continued to see G. T. Johnson about various matters. Vaden asked Johnson on several occasions to dispose of traffic tickets. In turn, Johnson contacted respondent about these matters. In one case, Vaden contacted Johnson concerning Billy Joe Ramsey's speeding ticket. Vaden introduced Ramsey to Johnson and asked him to help Ramsey. Thereafter, Johnson contacted the respondent about it and asked if he would help with it. Johnson testified that he gave the respondent the pink copy of the citation, and the respondent advised that he would get some lawyer or friend to handle it. Thereafter, Johnson testified that the respondent wrote to him and advised him as to which law firm to forward the court costs.

Commission Exhibit XIV contains the citation given to Billy Joe Ramsey for speeding 64 m.p.h. in a 45 m.p.h. zone. The Commission heard the testimony of Edward L. Powell, an attorney in Winston-Salem, who testified that respondent called him concerning the Ramsey ticket. Powell stated that the respondent said that he had a friend who had a traffic case in the next day or so in Winston-Salem and asked for someone in his firm to handle it. Powell replied that they would do so. The respondent indicated that the person would not be there for court and asked that they try to do the case with a waiver of appearance. Powell testified that he appeared in Forsyth District Court and represented Mr. Ramsey and obtained a judgment for him. Within the next day or so, Powell stated that he wrote a short letter to the respondent and sent a copy of the bill of costs paid by the firm. Powell testified that he had never seen nor did he know Mr. Ramsey and he did not know G. T. Johnson.

Johnson testified that Dennis Pardue, the nephew of Dickie Pardue, is the son of Vestal Pardue who ran a store across the

road from Johnson's house. He stated that Vestal asked him if he could help Dennis, who had been arrested on drug charges in Surry County. Vestal asked if the respondent would be the judge as he had been introduced to the respondent when the respondent and Johnson had stopped by Vestal's store on one occasion when they were carrying mulch to the respondent's home in Greensboro. Johnson advised Vestal to keep him posted, and about a week before the case came up, Vestal advised Johnson that the respondent was going to be the judge. Johnson testified that he called the respondent at Dobson during the first part of the week he was holding court and advised him that the nephew of the man "who run the store at the foot of the hill" was in court. Johnson advised that he didn't think there was much to it and that he would like for the respondent to help him and not to send him off. Johnson testified that the respondent replied that he would, and that he did help him. Johnson stated that he did not charge for this but did it for friendship.

Commission Exhibit IX indicates that the defendant was indicted on 4 September 1980 for possession with intent to sell and deliver methaqualone. The transcript of plea indicates that the defendant pleaded to felony possession of a Schedule II substance and would receive a suspended sentence on the condition that he spend a certain number of weekends in the county jail to be determined by the court. The respondent placed the defendant on probation and did not require any weekends to be served.

Reid Vaden was arrested along with Carl McLaurin and others in High Point on a marijuana charge. Johnson testified that Vaden came to see him and asked if he could help him with his troubles. Johnson sent him to see John Hall and ultimately collected sixteen thousand three or four hundred dollars from Vaden on behalf of Vaden and McLaurin for the purpose of arranging probation for the two of them. Johnson led him to believe that the money was being paid to "his people." Vaden and McLaurin entered pleas of guilty during the November 1981 trial. Vaden began cooperating with the SBI in an effort to determine the disposition of the money paid to Johnson.

The case came on for sentencing on 15 December 1981 and was continued by defense motion to 18 January 1982 in High Point. On that day, Vaden visited Johnson with news that the

respondent would be presiding in High Point. Johnson advised that the respondent was expected to attend a Christmas party at his lake house and he would discuss it with him at that time.

Vaden checked with Johnson on 5 January to determine the status of his case before the respondent. On that day, Johnson telephoned the respondent in Greensboro, verified that the judge would be holding court in High Point on 18 January, and told the respondent that he needed to discuss a matter with him. Arrangements were made for the respondent to come to Johnson's house two days later, on 7 January 1982. Johnson testified that the respondent arrived at about six o'clock, and Johnson said "he got right into it." Johnson stated that he explained to the respondent that two fellows had a problem in High Point, that they both worked for R. J. Reynolds, that they were good friends, and that Johnson really wanted to help them keep their feet on the ground. The respondent replied that he would help if he could. Johnson advised who the lawyer was and asked the judge "If they plead guilty to something that's mandatory . . . what can you do in a situation like that?" Johnson stated that the respondent replied: "I'll . . . Well, I'd talk to the D.A. and see if he would—ask him to reconsider." At that point, Vaden arrived and Johnson introduced him to the respondent. The respondent excused himself to go to the bathroom and Johnson and Vaden talked a couple of minutes. Vaden then shook hands with the respondent and left.

After Vaden left, Johnson told the respondent, "that's the fellow I'm trying to help" and "I don't know why in hell he come in here at a time like this." At that point, Johnson gave the respondent the key to the lake house and some groceries. The following morning, Friday, 8 January, the respondent returned the key to Johnson. They briefly discussed the Vaden matter, and Johnson testified that the respondent advised Johnson that Vaden should obtain some character letters.

The following day Vaden again visited Johnson's residence, and Johnson advised him concerning his conversations with the respondent about his case and the advice concerning character letters. Johnson then indicated that he would need five thousand more dollars. Arrangements were made to meet on Monday, 11 January, in Winston-Salem, where the transfer of the money took

place. Johnson was arrested by SBI agents shortly after this transfer.

With respect to *finding 9(a)*, the evidence disclosed:

Johnson testified that a friend of his had "lined up" three girls to take to his lake house. One of the girls had received a speeding ticket on which she desired Johnson's assistance. After dinner and drinks, Johnson had sex with one of the girls. Approximately a week after this incident, Johnson called the girl with whom he had engaged in sexual relations and "lined up" her and one of the other girls for him and respondent to "take out." For some reason, that arrangement did not come to pass. Approximately three weeks thereafter, Johnson was served with arrest warrants charging him with the rape of the girl with whom he had engaged in sexual relations. The matter came up in Wilkes County District Court, where it was dismissed for lack of jurisdiction on 23 March 1973. The victim appears as Kathy Lovette. [Johnson's lake house is located in Alexander County.] Johnson testified that after he was aware that Ms. Lovette sought to charge him with rape, he approached the respondent and asked him "if he'd help." Johnson informed respondent that there was no rape to it and that she was one of the girls that he and the respondent were to have taken out. The respondent replied that it bothered him.

The respondent then informed Johnson that he would call Butch Zimmerman. Thereafter, the respondent told Johnson that he called Butch Zimmerman and that just as he got into a discussion of the matter, Butch hung up on him. Johnson testified that the respondent told him that Zimmerman had told the respondent that the call was unethical and said he would not discuss it with the respondent.

H. W. "Butch" Zimmerman, Jr. testified that he is the Solicitor of the Twenty-Second Judicial District and has been so since 1970. Alexander is a county in that district. Zimmerman testified that his first knowledge of a case involving G. T. Johnson alleging rape came about as a result of a call he received in 1973 at his home in Lexington. The call was from respondent to an apartment that Zimmerman and his wife were living in at the time. The respondent began discussing the rape case involving G. T. Johnson, and Zimmerman became upset and abruptly hung

up the phone. Zimmerman testified that he considered the call and discussion to be improper since he "felt like he should not be talking to me about a case [like] that." Thereafter, there was a period of estrangement between Zimmerman and respondent that lasted for some time.

Later, Zimmerman spoke with Kathy Lovette and her lawyer about the case, in a conversation which he tape recorded and retained. Based thereon, he drew a bill of indictment which was submitted to the Alexander County Grand Jury on 9 April 1973. Zimmerman testified that it was his opinion that a bill should be submitted. The grand jury found not a true bill. Zimmerman further testified that although he had tried several cases before respondent, he did not socialize in the evenings with him.

The respondent admitted calling Butch Zimmerman but denied he did so on behalf or at the request of G. T. Johnson. He testified that he had received some information from "a source in Wilkes County" that the young lady "had some motive and was unreliable." He confirmed that Butch Zimmerman hung up on him, apparently resenting his call. The respondent admitted that he and Zimmerman were "at odds" for a while after this call. The respondent testified that his "source" was Bob Parker. Respondent presented Bob Parker as a witness, but Parker failed to corroborate this alleged conversation.

Evidence supporting *finding 9(c)*:

Vontenia Robinette was charged in Alexander County with sale and delivery of marijuana. Robinette was acquainted with G. T. Johnson through Johnson's vending business, because Robinette had assisted him in the placement of machines in various locations. After his arrest, he came to Johnson's car lot and solicited Johnson's assistance. He agreed to pay Johnson two thousand dollars for his help and influence. Johnson referred him to John Hall, and when the case came up in court, Johnson approached the respondent about it. He advised the respondent that Robinette was a friend of his who had helped him out in his business. He advised the respondent that he would appreciate it if he could help him out, and the respondent replied that he would do so and put him on probation. Johnson said he asked the respondent "not to send him off" and "so he put him on probation."

Commission Exhibit IV shows that during the 8 March 1976 term of superior court in Alexander County, over which the respondent presided, Robinette pleaded guilty in the case 75CR1112. Robinette entered a plea of guilty to felonious sale of marijuana. This was a straight-up plea, with no plea bargain. SBI Agent Richard Lester testified that an undercover agent had purchased some six pounds of marijuana from Robinette. The respondent accepted the defendant's plea and entered a probationary judgment against the defendant which included special conditions relating to the consent search of the defendant's person, place, or vehicle by law enforcement or probation officers and to the house arrest of the defendant for six months.

A short time after this sentence was imposed, Robinette came back to see Johnson. As Johnson testified, Robinette said the policemen in Taylorsville would stop him and search his vehicle which was apparently full of carpentry and painting supplies. Robinette said he wanted to get out from under that part of the probation judgment. Johnson told Robinette that he would contact the respondent and ask him if he would do away with that part of it. Johnson testified that he contacted respondent, and the respondent related that he would sign an order striking the condition. Respondent advised Johnson to have someone draw up the paper. Johnson related this conversation to Robinette and advised him to go see John Hall because he would know what to do to fix up the proper papers. Johnson also advised him to tell Hall to get the paper to the respondent and that the respondent would take him off that part of it. Robinette advised Johnson later that he did do so.

Commission Exhibit IV contains an order prepared on the stationery of John Hall which is entitled "Order" and is signed and dated by the respondent on 28 April 1976. In that order, the respondent finds that two of the conditions of a suspended sentence (house arrest and search by law enforcement officer) are serving no useful purpose. It orders that those portions of the judgment ordering the defendant to remain under house arrest, save and except the time that he was gainfully employed and pursuing his employment, and the condition ordering the defendant to consent to a search of his person or vehicle without a search warrant be deleted. Having already discussed this matter with Johnson, the respondent entered this order at the request of John

Hall. The respondent recalled that John Hall asked him to strike the provision relating to search because Robinette was a handyman or house painter. This order was entered out of court.

Commission Exhibit IV-B contains a letter from the Clerk of Superior Court in Alexander County, Mr. Chapman, who certified a list of terms of superior court in Alexander County for the year 1976. The only term that the respondent held in Alexander County was 8 March through 12 March 1976 (at which term the original sentence was imposed—9 March 1976 being the date of the probation judgment). There was no term of superior court in Alexander County on 28 April 1976. In fact, the next criminal term from the one over which respondent presided on 8 March was a 12 July term presided over by Judge Rousseau. On cross-examination, Special Counsel questioned the respondent concerning an affidavit made by John Hall which was submitted to the Commission on behalf of the respondent. In that affidavit, Hall swore that he made a motion to strike these conditions at the April session in Alexander County in open court before respondent and that the respondent granted his motion and directed that he prepare an order with regard thereto. There was no April session of court over which the respondent presided, and there were no criminal sessions in Alexander (or mixed) between the March and July terms. John Hall did not testify as a witness for the respondent. He was the attorney in both Vaden cases and also in the Robinette cases.

SBI Agent Richard Lester testified that he learned of the modification several months after the trial when he happened to be in Alexander County at the sheriff's office. A deputy related to him that he had stopped Robinette and smelled alcohol. When they attempted to search the vehicle under the provisions of the probation judgment, Robinette advised them that they needed a search warrant. When they said they didn't, he told them to check the courthouse. The deputy then went to the clerk's office and found the modification. Lester testified that he saw Butch Zimmerman several days later and related this to him and Zimmerman stated that he did not know it had been changed.

Butch Zimmerman testified that he prosecuted Robinette on the original charge. He testified that he learned of the modification for the first time from Agent Lester. Zimmerman stated that

he became upset with the modification. He further testified that John Hall never communicated with him in any fashion concerning the modification.

Sam Boyd, Robinette's probation officer, testified that he was in court on the day Robinette was placed on probation and that he prepared the probation judgment. He identified the Robinette probation judgment as the one he prepared. He further testified that he was not consulted by the respondent at any time concerning a modification nor was he aware that the modification had been made. He further testified that in his experience he had never seen an order of probation changed in this way.

Edward Hedrick, an attorney from Taylorsville, testified that he represented Robinette on this offense. He testified that he appeared for Robinette at the probable cause hearing and that sometime thereafter Robinette asked Hedrick if it would offend him if he retained John Hall as additional counsel to assist in the case. Hedrick replied that it would not and Hall entered the case. Hedrick testified that both he and Hall negotiated the plea and appeared in court for the original sentence. He was not approached concerning an amendment to the probation order. Furthermore, even though he was Robinette's attorney, he learned of the deletion only after it occurred, either from Robinette or from a local officer.

Evidence supporting *finding 9(d)*:

Carol Bryson Pruitt (now Bowen) appeared before the respondent on Friday 17 December 1971, in Forsyth County Superior Court on a charge of driving under the influence in case number 71CR35584. This case was on appeal from a Forsyth District Court adjudication of guilt on 22 November 1971. In the district court, the defendant, upon her conviction for DUI, received a sentence of six months suspended for three years, with a fine of one hundred dollars and costs. Before the respondent, the defendant pleaded to careless and reckless driving. This disposition, which took place less than four weeks from the district court proceeding, occurred on the last day of the last two-week criminal session of Forsyth County Superior Court over which the respondent presided from that date through 1 July 1972. This case was also not on the printed calendar. James C. Yeatts, the Assist-

ant District Attorney who prosecuted this case, testified that this term would have been the respondent's last term there.

Carol Bryson Pruitt testified that prior to her appearance in Forsyth Superior Court before the respondent, she had known him previously. She testified that she met him at the Gold Leaf Supper Club in Winston-Salem a year, or maybe two years, before the trial. After meeting him that night, she and the respondent went out and had sexual relations. Approximately three weeks before she appeared in court, Ms. Pruitt testified that she saw the respondent at a restaurant. She testified that he smiled and spoke, and she asked to talk with him, but he indicated he was with some people. She then saw the respondent when she appeared in court on this charge. Thereafter, she testified that she called him that afternoon and told him that she would like to see him. She testified that he agreed to meet her at Howard Johnson's. At that meeting, she asked the respondent to go off with her, but he said no. The respondent conceded that Ms. Pruitt's testimony was basically true. He admitted that he met her at a nightclub one evening when he was probably in Forsyth County holding court. He testified that they went to the Holiday Inn, although he couldn't be sure, and that he engaged in sex with her.

James Yeatts testified that in December of 1971 he was employed as an assistant district attorney in Forsyth County. He testified that he worked in the district court for a couple of years and came in October of 1971 as a new superior court assistant. He stated that one day during a lunch break or recess when everyone else was out, the respondent came to him concerning this case. He testified that respondent related that "he had a lady that was either a friend of his or maybe a friend of a friend of his." The respondent told him that "this lady, or I got the impression that she was a single parent maybe supporting one or two children; and he told me that she was charged with this offense." Yeatts testified that the respondent asked "that he would like for me to—I cannot remember the exact words but to look into, help, consider something about her case." Yeatts testified that he had never had a private conversation with respondent before this time and that the respondent complimented him and told him that he was either a good prosecutor or had the potential to be a good prosecutor. As a result of this conversation, Yeatts testified that

he called the Winston-Salem Police Department in an effort to learn about the case. He stated that he attempted to speak with the arresting officer, but he could not reach him. He spoke with another officer who told him there was no breathalyzer and that she was only observed driving for a short distance.

Shortly after that, in January or February of 1972, Yeatts learned from another assistant in his office that there was a breathalyzer as well as a movie of this defendant. He testified that later that week he visited the police department and viewed the movie, which showed Ms. Pruitt to be highly intoxicated. He also learned that the breathalyzer reading was .15. Yeatts said he apologized to the officer for the mistake.

Thereafter, Yeatts stated that he obtained a transcript of the proceedings for 17 December 1971 from respondent after he learned from a court reporter that respondent had asked the reporter to prepare a copy for him in connection with another investigation. Yeatts went to see the respondent, who gave him a copy. Yeatts testified that after reading the transcript, he felt hoodwinked or fooled. Yeatts testified that he had learned the reputation of respondent during the period from 17 December 1971 until the time that he obtained the transcript. He related that reputation as follows: "The reputation that I knew about Judge Kivett there in Winston-Salem was that he liked the women, maybe intimately." He stated that he was not familiar with that reputation in December of 1971.

The respondent testified that he asked Mr. Yeatts to look into it. He said he did so at the request of her attorney, Harold Wilson. Mr. Wilson is now deceased. Mr. Yeatts testified that he did not recall any discussions about this case with Harold Wilson. The respondent testified that he recognized Ms. Pruitt when she came around to be sentenced. Respondent conceded that, upon reflection, it would have been better not to have been involved in this matter.

Evidence supporting *finding 9(e)*:

Mrs. Peggy King, who is currently employed as a probation officer for the State of North Carolina, testified that she will have been a probation officer for fifteen years in October. When she was first employed, she worked a total of eight counties out of

her office in Statesville. One of those counties was Rowan. In late 1969 or early 1970, she had occasion to be in Rowan County during court. She testified that she was in the probation office during the noon recess when Frank Montgomery, who was clerk of court at that time, and the respondent came by the office and asked her to go to lunch. She agreed to accompany them to a public restaurant near the depot in Salisbury. Mrs. King testified that at the luncheon the respondent placed his leg to her left leg several times, and she asked him not to do that. She testified that he persisted again, and she told him that if he did it again, she would hit him. She testified that she told him that she was a married lady and was he not a married man. She testified that he said that he wasn't but his wife was. Concerning the contact, she testified:

> I remember that I had a dress on, because . . . because we could not wear pants suits or anything up until maybe 1974 or so. . . . He placed his—I don't know which leg; I just don't know—his leg around my left leg and in between my legs.

She testified that when he did this, she hit him in the arm or shoulder. After she hit him, the respondent stated that he had never been hit by a lady probation officer. On cross-examination, Mrs. King testified that she considered this activity on the part of the respondent to be a sexual assault. She testified that this occurred in late 1969 or early 1970.

One of respondent's own witnesses, Jack Harris, an attorney in Statesville, testified that Mrs. King's general reputation and character was good. He also indicated that she was well thought of as a probation officer. As well, Wanda Anderson, the woman with whom the respondent admitted engaging in sexual relations at G. T. Johnson's lake house, recalled that the respondent related that a female probation officer had struck him on a prior occasion.

Evidence supporting *finding 9(f)*:

W. Douglas Albright testified that he is a judge of the superior court in Greensboro and has been so since 1975. Judge Albright related that on 17 December 1982, between 4:00 and 4:15 p.m., he received a call at his home from the respondent. Judge Albright related that the tone of the respondent's voice was very different from the voice that he had heard on many occasions;

that it was urgent and very agitated. The respondent stated that he was calling from High Point. He related that he had just received evidence from an unimpeachable source that the District Attorney, Mike Schlosser, had made a deal with a Donna Smith in order to put this woman before the grand jury on the following Monday. Respondent related that this witness was supposedly to implicate him in connection with some type of drug deal at Green's Supper Club sometime back. He related that Schlosser was trying to ruin him and that the girl is unreliable. Respondent then told him that he, Judge Albright, was his last hope. Judge Albright testified that: "[H]e desperately needed me to issue a restraining order to stop the grand jury from coming in on Monday; and as I recall he said, 'Doug help me on this. You know I'd do the same for you.'"

Judge Albright testified that there was a pause and that he responded as follows: "Charlie, on whose motion is such an order to be issued?" Judge Albright stated that there was another pause and his response was "What do you mean?" Judge Albright responded, "Charlie, if it were to come out that you as the target of the grand jury investigation, the one to be indicted, and me a sitting judge had conferred and strategied and confederated to stop the grand jury from sitting so they couldn't indict you and prevented a bill from being submitted that was to be submitted, that they might make a case of obstruction of justice." Judge Albright further testified that he told the respondent that it wouldn't look right and how could it be justified.

Judge Albright stated that respondent's response was: "You won't do it then?" and Judge Albright told him: "No." Then the respondent said, "All right . . . I don't know what to do. I guess I'll have to call someone in Raleigh." Judge Albright related that at that point, without any further discussion, respondent hung up. Judge Albright stated that it was an abrupt termination of the conversation. Judge Albright estimated the length of the phone conversation to have been not less than five nor more than seven minutes.

At 4:28 p.m., Judge Albright called Franklin Freeman at the Administrative Office of the Courts in Raleigh and related the conversation as it had occurred. He later had a longer conversation with Franklin Freeman that evening. On Monday, no grand jury came in.

The respondent testified that he called Judge Albright and asked him to "restrain the grand jury until Judge McKinnon could get there." He further testified that "I told Judge Albright that if he felt that there was any impropriety in it, I did not want him to do anything." Lisa Tate, the daughter of respondent's lawyer Richard Tate, was called as a corroborating witness for the respondent. She testified that she overheard respondent's conversation with Judge Albright. She stated that the respondent asked Judge Albright if he would "convince Mr. Schlosser" not to take this action.

We hold that each of the findings of fact by the Judicial Standards Commission is supported by ample competent clear and convincing evidence. *In re Nowell, supra,* 293 N.C. 235, 237 S.E. 2d 246. We therefore accept the Commission's findings and adopt them as our own.

[4]  We now consider whether, upon these findings, respondent's actions constitute willful misconduct in office, conduct prejudicial to the administration of justice, or both. Each case arising from the Judicial Standards Commission is to be decided upon its own facts. *In re Hardy,* 294 N.C. 90, 240 S.E. 2d 367 (1978). It is settled law that this Court is not bound by the recommendations of the Judicial Standards Commission and that this Court must consider all of the evidence and exercise its independent judgment as to whether it should censure, remand, or dismiss the proceedings against respondent. *In re Martin,* 295 N.C. 291, 245 S.E. 2d 766 (1978).

The following fundamental principles of judicial decorum, due administration of justice, and due process are pertinent to this determination:

1. "The place of justice is an hallowed place; and therefore not only the bench, but the foot-pace and precincts and purprise thereof, ought to be preserved without scandal and corruption." C. Northup, *The Essays of Francis Bacon* 168 (1936).

2. "A judge should uphold the integrity and independence of the judiciary." Canon 1, North Carolina Code of Judicial Conduct, 283 N.C. 771 (1973).

3. "A judge should avoid impropriety and the appearance of impropriety in all his activities." Canon 2, Code of Judicial Conduct, *supra.*

4. "A judge should perform the duties of his office impartially and diligently." Canon 3, Code of Judicial Conduct, *supra.*

5. A judge should, except as authorized by law, "neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding." Canon 3(A)(4), Code of Judicial Conduct, *supra.*

6. "Any disposition of a case by a judge for reasons other than an honest appraisal of the facts and the law, as disclosed by the evidence presented, will amount to conduct prejudicial to the proper administration of justice." *In re Peoples, supra,* 296 N.C. 109, 154, 250 S.E. 2d 890, 916.

7. "The fact that a judge receives no personal benefit, financial or otherwise, from his improper handling of a case does not preclude his conduct from being prejudicial to the administration of justice. The determinative factors aside from the conduct itself, are the results of the conduct and the impact it might reasonably have upon knowledgeable observers." *Id.*

8. "The trial and disposition of criminal cases is the public's business and ought to be conducted in open court. The public, and especially the parties, are entitled to see and hear what goes on in the court." *Id.*

9. "A criminal prosecution is an adversary proceeding in which the district attorney as an advocate of the State's interest, is entitled to be present and be heard. Any disposition of a criminal case without notice to the district attorney who was prosecuting the docket when the matter was not on the printed calendar for disposition, improperly excluded the district attorney from participating in the disposition." *Id.*

10. " 'A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.' " *Id.* (citation omitted).

The terms "willful misconduct in office" and "conduct prejudicial to the administration of justice" are, like fraud, so multiform as to admit of no precise rules or definition. *Id.* As Chief Justice Branch stated for the Court in *In re Martin*, 302 N.C. 299, 316, 275 S.E. 2d 412, 421 (1981):

> We do not agree, nor have we ever held, that "wilful misconduct in office" is limited to the hours of the day when a judge is actually presiding over court. A judicial official's duty to conduct himself in a manner befitting his professional office does not end at the courthouse door. *See In re Haggerty*, 257 La. 1, 241 So. 2d 469 (1970). Whether the conduct in question can fairly be characterized as "private" or "public" is not the inquiry; the proper focus is on, among other things, the nature and type of conduct, the frequency of occurrences, the impact which knowledge of the conduct would likely have on the prevailing attitudes of the community, and whether the judge acted knowingly or with a reckless disregard for the high standards of the judicial office.

Upon applying these principles to respondent's conduct, we hold that respondent's conduct constituted willful misconduct in office and conduct prejudicial to the administration of justice. The evidence shows that over the years respondent has pursued a course of conduct which reflects at least a reckless disregard for the standards of his office.

[5] The findings in 9(b) and (e), which we have adopted, constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The relationship between Johnson and respondent placed respondent in a position where Johnson could insidiously and directly impose his will upon respondent. The respondent's position as a judge was compromised. This conduct violated Code of Judicial Conduct Canons 1, 2, and 3, as well as precepts 6, 8, 9, and 10 set forth above. Respondent's conduct with respect to the female probation officer brought the judicial office into disrepute. It, too, violated Canon 2. This conduct (9(b) and (e)), standing alone, is insufficient to support an order of removal. "A judge should be removed from office and disqualified from holding further judicial office only for the more serious offense of wilful misconduct in office." *In re Peoples, supra,* 296 N.C. at 158, 250 S.E. 2d at 918. However, it does support an order of censure of respondent.

[6]   The remaining findings, which we have adopted, 9(a), (c), (d), and (f) constitute willful misconduct in office, supporting an order of removal.

Finding 9(a) involves respondent's telephone call to Solicitor Zimmerman. Johnson testified that after he was charged with rape, he talked to respondent about the charge and asked him if he could help him. Respondent told Johnson that he would call Zimmerman and did so. Solicitor Zimmerman, realizing that it was improper for respondent to call him about a pending case, became angry, cursed, and hung up the telephone. Later, respondent related this series of events to Johnson. Respondent's argument that he only wanted to inform Zimmerman that the prosecuting witness was not reliable and that he should look into the case carefully does not ring true. Even if it were true, it would avail the respondent little. Judges should not advise solicitors about their private opinions concerning pending cases, and especially ex parte, in the absence of defendant and his counsel. Can it be said that it would be appropriate for a judge to advise a solicitor, ex parte, that the state had a good case and that he should prosecute with full vigor? When the judge enters into this realm he becomes an advocate and abrogates his position of impartiality. This conduct violated Code of Judicial Conduct Canons 1 and 3, and precepts 5, 6, 8, and 10 set out above. We hold that the respondent's conduct with respect to this finding constitutes willful misconduct in office.

The actions of respondent in sentencing and in thereafter changing the probation judgment in the case of Vontenia Robinette constitute willful misconduct in office (finding 9(c)). To procure Johnson's assistance in this case, Robinette paid him $2,000. Johnson requested that respondent help him. Respondent told Johnson he'd "try to help him and put him on probation or something." Robinette was placed on probation. A short time later, Robinette complained to Johnson about officers searching him pursuant to the terms of the probation judgment. Johnson again went to respondent, who agreed to modify the judgment. Johnson told Robinette to go to attorney John Hall and Hall would know what papers to prepare for the judge. He did so, and respondent signed an order eliminating the "consent to search" condition as well as the "house arrest" condition. This order was entered without notice to the solicitor, probation officer, or

Robinette's original attorney, Edward Hedrick. It was entered on 28 April 1976, a time when respondent was not assigned to hold court in Alexander County.

Respondent argues that the "consent to search" condition was invalid and that he removed it upon the request of attorney Hall. Hall, although available, was not called by respondent as a witness. N.C.G.S. 15A-1343(b)(15) was amended effective 1 July 1978 to restrict searches as a condition of a probation judgment to those performed by a probation officer. In *State v. Moore*, 37 N.C. App. 729, 247 S.E. 2d 250 (1978), the court held that probation judgments entered prior to 1 July 1978 with a search condition by law enforcement officers were valid. Contrary to respondent's argument, the evidence shows that he also included a "search by any law enforcement officer" condition in the probation judgment of James "Dickie" Pardue. This judgment was entered by respondent on 2 December 1977, nineteen months *after* respondent amended the Robinette judgment.

We hold that this action by respondent violated Canon 3(A)(4) of the Code of Judicial Conduct, 283 N.C. 771, and precepts 6, 8, 9, and 10 set out above, and constitutes willful misconduct in office. *In re Edens*, 290 N.C. 299, 226 S.E. 2d 5 (1976) (judge disposed of criminal case outside courtroom and out of session without notice to district attorney); *In re Crutchfield*, 289 N.C. 597, 223 S.E. 2d 822 (1976) (judge granted limited driving privileges ex parte).

We hold that respondent's actions in suggesting to an assistant district attorney that he "help" Carol Pruitt with respect to her driving under the influence charge constitute willful misconduct in office (finding 9(d)). Respondent met Carol Pruitt at the Gold Leaf Supper Club in Winston-Salem a year or two before her trial on this charge. Respondent went out with her and had sexual relations with her. Ms. Pruitt did not see respondent again until about three weeks before her trial in respondent's court. At that time he spoke to her, and she told him that she wanted to talk with him. Respondent replied that he was with some people and was busy and could not speak with her. Assistant District Attorney Yeatts testified that respondent came to his office during a lunch break and indicated to him that Ms. Pruitt was a friend of his or a friend of a friend, that she was a single parent supporting one or two children, and requested that he look into the case and

"help." The court records show that the case was not on the printed calendar for this session, which was the last that respondent would hold in the district during the six-month assignment. Yeatts made some investigation in the case and decided to accept a plea to careless and reckless driving. After the plea was taken and sentence imposed by respondent, Yeatts discovered that there was evidence of a breathalyzer reading of .15 and also a movie of Ms. Pruitt at the time of her arrest, portraying her as being highly intoxicated.

Respondent testified that he approached Yeatts about the case because Pruitt's attorney, Harold Wilson, wanted to know whether the state would accept a plea to a lesser offense. Wilson was deceased at the time of the formal hearing. Respondent further stated that at the time he discussed the case with Yeatts, he did not recall who the woman was, but that he did recognize her when she appeared before him in court on the charge.

After the case was disposed of by respondent, Ms. Pruitt called him that afternoon and asked him to meet her at Howard Johnson's parking lot. Respondent did so, and Ms. Pruitt offered to go off with him, but he refused to do so. Respondent spoke with her about her drinking problem and left. Respondent admitted that Ms. Pruitt's testimony was basically true.

The superior court judge is the dominant person during court sessions. This is particularly true with young, inexperienced lawyers and prosecutors. When asked whether respondent's discussion of the Pruitt case affected his decision to accept the lesser plea, Yeatts made this poignant reply: "Well, of course, in 1971 and I guess still in 1983, when a superior court judge comes to you and asks you to do something as an assistant DA, you usually do it. You usually move however he says for you to move. I did as he requested, if that's what you're asking."

The use of a judge's office to grant leniency or favors to a defendant because of sexual activities between a judge and a defendant is willful misconduct in office. *In re Martin, supra,* 302 N.C. 299, 275 S.E. 2d 412. The actions of respondent in this respect were improper and wrong and done intentionally in his official capacity as a superior court judge. *In re Edens, supra,* 290 N.C. 299, 226 S.E. 2d 5. Respondent's conduct violated Canon 3(A)(4) of the Code of Judicial Conduct, *supra,* and precepts 6, 8,

and 10 hereinabove set forth. Respondent abandoned his position as an impartial judge and became an advocate on the behalf of Ms. Pruitt.

Finding 9(f) involved respondent's efforts to prevent the convening of the Grand Jury of Guilford County. The evidence supporting this finding clearly and convincingly proves an attempt by respondent to obstruct justice and to do so for his own benefit. Judge Albright's testimony is plain and unequivocal.

Although the evidence supports a conclusion that it constitutes a criminal offense, an attempt to obstruct justice, it is not necessary that conduct be criminal in order to constitute willful misconduct in office. Obstruction of justice is a common law offense in North Carolina. Article 30 of Chapter 14 of the General Statutes does not abrogate this offense. N.C. Gen. Stat. § 4-1 (1981). Article 30 sets forth specific crimes under the heading of *Obstructing Justice,* such as: N.C.G.S. 14-223, resisting arrest; N.C.G.S. 14-221, breaking into jails; N.C.G.S. 14-221.1, altering evidence of criminal conduct; N.C.G.S. 14-225.1, picketing with intent to influence the administration of justice; N.C.G.S. 14-225.2, harassment of jurors; N.C.G.S. 14-226, intimidating witnesses. There is no indication that the legislature intended Article 30 to encompass all aspects of obstruction of justice. This is illustrated by the legislature placing N.C.G.S. 14-220, bribery of jurors, surely an obstruction of justice offense, in Article 29, *Bribery.*

"At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice. The common law offense of obstructing public justice may take a variety of forms . . . ." 67 C.J.S. *Obstructing Justice* §§ 1, 2 (1978). Respondent's conduct with respect to the attempt to prevent the convening of the grand jury would support a charge of common law obstruction of justice. It also violates Canons 1, 2(A), 3(A)(4), and precepts 8, 9, and 10 above set forth. We hold respondent's actions under finding 9(f) constitute willful misconduct in office.

Respondent also raises the following issues:

[7]  1. That the Judicial Standards Commission violated the requirements of notice under JSC Rule 7. This rule requires that a judge be notified of a preliminary investigation with respect to

his conduct and that he be informed of the nature of the charges. A respondent is also to be informed that he has the right to present relevant matters to the Commission if he so chooses. In this case, the notice sent to respondent fully informed him of the nature of the charges being investigated and specifically set forth eight events or transactions involved. He was also advised of his right to submit materials to the Commission for their consideration during the investigation and, in fact, respondent did so. We hold that the Judicial Standards Commission complied with Rule 7 and that respondent's due process rights were not violated. *In re Martin, supra,* 302 N.C. 299, 275 S.E. 2d 412.

[8] 2. Respondent argues that the combination of the investigative and judicial functions within the Judicial Standards Commission violated respondent's due process rights. This argument has been resolved against respondent by this Court in *In re Nowell, supra,* 293 N.C. 235, 237 S.E. 2d 246. "It is well settled by both federal and state case decisions that a combination of investigative and judicial functions within an agency does not violate due process. An agency which has only the power to recommend penalties is not required to establish an independent investigatory and adjudicatory staff." *Id.* at 244, 237 S.E. 2d at 252; *Richardson v. Perales,* 402 U.S. 389, 28 L.Ed. 2d 842 (1971).

3. Respondent argues that the testimony of Joyce Gibson was so prejudicial that it rendered all other findings and recommendations a nullity. We reject this argument. We will not further stain the pages of our reports by setting out the details of this testimony. The count to which this evidence was addressed was withdrawn and not considered by the Judicial Standards Commission in making its findings and recommendations. The chairman stated, "The Commission is in no wise considering evidence of Joyce Gibson." This Court has the final authority to review the evidence in this case and determine the appropriate result. This Court has not considered the testimony of Joyce Gibson in carrying out its duties in this proceeding.

[9] 4. The Judicial Standards Commission did not err in failing to make findings concerning respondent's character or credibility. The Judicial Standards Commission is not required to make such findings. Respondent testified before the Commission, and it passed upon his credibility. There was diverse and contradictory

evidence upon which a finding could be made as to respondent's character. In its recommendation, the Commission recited that it "heard the evidence presented and . . . observed the demeanor and *determined the credibility of the witnesses* . . . ." (Emphasis added.) Further it was not required to do in this respect.

[10]  5. Respondent contends that the principles of the ex post facto doctrine and his reelection to office after the conduct complained of bar this proceeding. We do not agree. The statute creating the Judicial Standards Commission was effective 1 January 1973. Only the conduct contained in findings 9(d) and (e) occurred prior to 1 January 1973. Counsel for the Commission argues, and we think properly, that the ex post facto doctrine does not prohibit the Commission from considering evidence of conduct by a judge that would constitute grounds for impeachment prior to 1 January 1973. The remedies provided by the establishment of the Judicial Standards Commission on 1 January 1973 did not abolish removal proceedings by impeachment but are cumulative thereto. *In re Martin, supra,* 295 N.C. 291, 245 S.E. 2d 766. Finding 9(d) with respect to Carol Pruitt constituted "corruption or other misconduct in his official capacity" by respondent within the meaning of N.C.G.S. 123-5 (1974) before its amendment effective 13 April 1974. This statute sets forth the grounds for impeachment of judicial officers. The assault by respondent on probation officer King would constitute the basis for a criminal prosecution, "the conviction whereof would tend to bring his office into public contempt." *Id.*

Therefore, all of the acts of respondent found by the Commission constituted grounds for removal at the time they were done. The ex post facto doctrine applies only to criminal prosecutions. *N.C. State Bar v. DuMont,* 52 N.C. App. 1, 277 S.E. 2d 827 (1981), *modified and aff'd,* 304 N.C. 627, 286 S.E. 2d 89 (1982); 16A C.J.S. *Constitutional Law* § 437 (1956). Judicial disciplinary proceedings are not criminal actions. *In re Nowell, supra,* 293 N.C. 235, 237 S.E. 2d 246. Nor do the procedural changes in the law with respect to judicial removal vitiate this proceeding. *In re Martin, supra,* 295 N.C. 291, 245 S.E. 2d 766; *N.C. State Bar v. DuMont, supra,* 52 N.C. App. 1, 277 S.E. 2d 827. *Procedural* changes of the law in criminal cases are not violations of the ex post facto doctrine. *Dobbert v. Florida,* 432 U.S. 282, 53 L.Ed. 2d 344 (1977).

These proceedings against respondent did not violate the ex post facto doctrine.

[11]   Neither is respondent protected by what has been referred to as "pardon by reelection." This Court rejected the argument in *In re Martin, supra,* 302 N.C. 299, 275 S.E. 2d 412 (1981). Nothing in the facts of this proceeding remove it from the holding in *Martin.*

The review of this proceeding has been a most serious undertaking by this Court. The preservation of the due administration of justice and the integrity and independence of the judiciary is one of the most important responsibilities of this Court. History has taught that without it, all else fails. "A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35 (1970). When we ask the question, suggested by Chief Justice Sharp in *In re Peoples, supra,* 296 N.C. 109, 250 S.E. 2d 890, our duty is manifest: What would be the quality of justice and the reputation of the courts for dispensing impartial justice if every judge conducted himself and exercised the duties of his office as Judge Kivett?

For the reasons stated and in the exercise of our independent judgment of this proceeding, it is ordered by the Supreme Court of North Carolina in conference on 6 December 1983 that respondent, Charles T. Kivett, be and he is hereby censured for the conduct specified in findings 9(b) and 9(e) of the Judicial Standards Commission.

It is further ordered by the Supreme Court of North Carolina in conference on 6 December 1983 that respondent, Charles T. Kivett, be and he is hereby officially removed from office as a judge of the General Court of Justice, Superior Court Division, Eighteenth Judicial District, for the willful misconduct in office specified in findings 9(a), (c), (d), and (f) of the Judicial Standards Commission. In consequence of his removal, respondent is disqualified from holding further judicial office and is ineligible for retirement benefits. N.C. Gen. Stat. § 7A-376 (1981).

Justice EXUM did not participate in the consideration or decision of this proceeding.