IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-116

No. 13PA21

Filed 4 November 2022

STATE OF NORTH CAROLINA

v.

WALLACE BRADSHER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 275 N.C. App. 715 (2020), vacating in part and finding no error in part in judgments entered on 19 June 2018 and 30 July 2018 by Judge Paul C. Ridgeway in Superior Court, Wake County, and remanding for resentencing. Heard in the Supreme Court on 29 August 2022.

*Joshua H. Stein, Attorney General, by James W. Doggett, Deputy Solicitor General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, and Michele A. Goldman, Assistant Appellate Defender, for defendant-appellee.*

BARRINGER, Justice.

In this matter, we consider whether the Court of Appeals erred by vacating defendant's conviction of felony obstruction of justice. Upon careful review, we conclude that the Court of Appeals erred. Therefore, we reverse the Court of Appeals' decision.

# I. Procedural Background

By superseding indictment, a grand jury indicted defendant Wallace Bradsher for conspiracy to commit obtaining property by false pretenses, obtaining property by false pretenses, aiding and abetting obtaining property by false pretenses, three counts of felony obstruction of justice, and willful failure to discharge the duties of office. After a nearly three-week-long trial, a jury returned a guilty verdict on obtaining property by false pretenses, aiding and abetting obtaining property by false pretenses, one count of misdemeanor obstruction of justice, one count of felony obstruction of justice, and willful failure to discharge duties of office. The jury acquitted defendant of the remaining charges. The trial court arrested judgment on the charge of obtaining property by false pretenses and entered judgment on the remaining convictions. After being sentenced, defendant appealed.

On appeal to the Court of Appeals, defendant presented multiple arguments, but the sole issue before this Court is whether there was sufficient evidence to convict defendant of felony obstruction of justice based on his false statements to the State Bureau of Investigation (SBI). Thus, the appeal before this Court only concerns Count V of the superseding indictment. Count V alleged that defendant "commit[ted] the infamous offense of obstruction of justice by knowingly and intentionally providing false and fabricated statements to David Whitley, agent of the [SBI] . . . designed to mislead the agent thereby impeding, delaying and obstructing the investigation, and

legal and public justice."

¶ 4     As to this issue, the Court of Appeals concluded that when taking the evidence in the light most favorable to the State, the evidence presented at trial supported a determination that defendant's statement that Cindy Blitzer worked on special projects was false. *State v. Bradsher*, 275 N.C. App. 715, 724 (2020). However, the Court of Appeals concluded that defendant's statement that Cindy Blitzer worked on conflict cases was not false given that a particular time period was not specified. *Id.* The Court of Appeals viewed this as an omission, not a false or fabricated statement. *Id.* Then, the Court of Appeals concluded that "the State did not provide substantial evidence of obstruction to support the conviction for felony obstruction of justice." *Id.* at 725.

¶ 5     The State petitioned this Court for discretionary review pursuant to N.C.G.S. § 7A-31, arguing that the Court of Appeals erred by vacating the felony obstruction of justice conviction for insufficient evidence. This Court allowed the State's petition for discretionary review.

## II.     Standard of Review

¶ 6     "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Crockett*, 368 N.C. 717, 720 (2016). The question for a court on a motion to dismiss for insufficient evidence "is whether there is substantial

evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98 (1980). "If so, the motion is properly denied." *Id.* Substantial evidence is the same as more than a scintilla of evidence. *Id.* at 99.

> In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy it beyond a reasonable doubt that the defendant is actually guilty.

*State v. Barnes*, 334 N.C. 67, 75–76 (1993) (cleaned up). In making this determination, a court "is to consider all evidence actually admitted, competent or incompetent, which is favorable to the State, disregarding defendant's evidence unless favorable to the State." *State v. Baker*, 338 N.C. 526, 558–59 (1994). "When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence." *State v. Fritsch*, 351 N.C. 373, 379 (2000).

### III.    Analysis

"At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice." *In re Kivett*, 309 N.C. 635, 670 (1983) (quoting 67 C.J.S. *Obstructing Justice* § 2 (1978)). When this common law offense is done with deceit and intent to defraud, it is a felony. N.C.G.S. § 14-3(b) (2021); *State v. Ditenhafer*, 373 N.C. 116, 128 (2019).

On appeal to this Court, the State argues that the Court of Appeals erred in the same manner as the Court of Appeals erred in *Ditenhafer*, 373 N.C. 116 (2019). According to the State, by reversing the Court of Appeals' holding concerning the sufficiency of the evidence for a felony obstruction of justice conviction in *Ditenhafer*, this Court "showed that courts should not construe indictments narrowly to escape their obligation to review evidence in the light most favorable [to] the State." The State asserts that the Court of Appeals assumed the State was pursuing a conviction on a non-pleaded theory about omissions, rather than viewing the evidence in the light most favorable to the State to assess whether defendant made false statements. The State also emphasizes that the meaning of testimony bears on the evidence's weight, not sufficiency, as reiterated in *State v. Tucker*, 380 N.C. 234, 2022-NCSC-15, ¶ 22. The State further notes that an answer's falsehood may depend on the statement's context.

Defendant contends that the State relied on an omission by defendant, rather

than a false or fabricated statement, for the felony obstruction of justice conviction. According to defendant, there was no evidence that Agent Whitley asked defendant if Cindy Blitzer was currently working on conflict cases. Defendant also argues that Agent Whitley never testified that any false or fabricated statement made by defendant on 6 September 2016 obstructed, impeded, or hindered his investigation.

¶ 10       From our review of the transcript and exhibits admitted at trial, we conclude that when viewing the evidence in the light most favorable to the State and giving the State the benefit of all reasonable inferences, a reasonable inference of defendant's guilt for felony obstruction of justice can be drawn from the circumstances. *See Barnes*, 334 N.C. at 75.

¶ 11       The State's evidence at trial showed the following: In mid-January 2015, defendant, the elected district attorney for Caswell County and Person County (District 9A), commenced employment of Cindy Blitzer. Also at that time, Craig Blitzer, the elected district attorney for Rockingham County (District 17A), commenced employment of Pam Bradsher. Pam Bradsher was defendant's wife; Cindy Blitzer was Craig Blitzer's wife. However, defendant and Craig Blitzer wanted to employ their own wives.

¶ 12       Initially, Cindy Blitzer, employed by defendant, worked from the Caswell County District Attorney's Office (District 9A) on Caswell County District Court matters with John Stultz, who was an assistant district attorney in that district. Pam

Bradsher, employed by Craig Blitzer, initially worked from the Rockingham County District Attorney's Office (District 17A). Yet, by March or April 2015, Pam Bradsher worked from the Person County District Attorney's Office (District 9A) on Person County matters. Around the same time, defendant authorized Cindy Blitzer to work from either the Rockingham County District Attorney's Office (District 17A) or from her home.

¶ 13    After this transition, Stultz assigned Cindy Blitzer to work on a case from Rockingham County that the district attorney's office in District 9A was handling (the Shockley case). Given this context, the Shockley case was classified as a conflict case. Cindy Blitzer reviewed and organized the file. She also worked on two or three other matters for Stultz "but nothing significant."

¶ 14    In May 2015, the State Ethics Commission informed defendant and Craig Blitzer that the prohibition against employing relatives under the State Government Ethics Act, N.C.G.S. § 138A-40, could not be waived. As a result, they could not hire their own wives as desired. Roughly three months later in August 2015, Pam Bradsher resigned from her employment with District 17A.

¶ 15    In light of Pam Bradsher's resignation, defendant asked Craig Blitzer to hire Tyler Henderson as a District 17A employee to work in District 9A and exclusively on District 9A matters. Henderson had previously been working for defendant in District 9A. Craig Blitzer agreed and hired Henderson. Henderson commenced work

as a District 17A employee on 18 August 2015, the day after Pam Bradsher's last day of work as a District 17A employee. Craig Blitzer did not supervise Henderson's work, and Henderson worked from the Person County District Attorney's Office on Person County matters.

¶ 16      Cindy Blitzer meanwhile remained employed by District 9A. At that time, Cindy Blitzer was working the hours that she claimed "[f]or the most part."

¶ 17      Also in August 2015, Stultz informed defendant that he did not feel comfortable trying the Shockley case in the proposed time frame, and defendant responded that he would take over the case and try the case. Defendant further stated that he would take over any responsibility for the supervision of Cindy Blitzer as it relates to the Shockley case and otherwise. After this conversation, Stultz never assigned any task to Cindy Blitzer.

¶ 18      An assistant district attorney informed the SBI in 2015 that Cindy Blitzer was not working the hours she claimed, and the SBI started investigating. For unexplained reasons, the investigation ended.

¶ 19      As of early March 2016, Cindy Blitzer was only working on the Shockley case. She had no other files or work. Defendant and Henderson went to the Rockingham County District Attorney's Office in March 2016 to retrieve the Shockley case file from Cindy Blitzer. During that visit, Craig Blitzer told defendant about the SBI investigation. In response, defendant told Craig Blitzer to vary Cindy Blitzer's time

by entering vacation and sick time.

¶ 20     After defendant and Henderson took the Shockley case file, Cindy Blitzer had no work to do. She called defendant to obtain work, but she never received a response from defendant. She also asked her husband to speak with defendant about her lack of work. Despite not working, she continued to put in her time as if she was working and received payment for that time.

¶ 21     In April 2016, Cindy Blitzer started a full-time nursing program at a university while still employed by District 9A. Craig Blitzer also informed defendant in April 2016 that Cindy Blitzer had no work to do since March 2016 when the Shockley case file was taken from her. Defendant responded to Craig Blitzer by telling him that Cindy Blitzer should concentrate on school and continue to input her time as if she was working. After this conversation, Cindy Blitzer never received any work.

¶ 22     Cindy Blitzer testified that:

> Q.     . . . [A]fter March when the Shockley case is taken away from you . . . [d]oes the defendant, Wallace Bradsher, reach out to you and ask you, "Hey, Cindy, where are you? Hey, Cindy, what's you working on? Hey, Cindy, why aren't you in the office? Hey, Cindy, can you come and help me with something or help someone in the office with anything?"
>
> A.     No.
>
> Q.     Does he ever at any point reach out to you or does anyone from his office ever reach out to you and request that you do any work whatsoever for the Person or Caswell County District Attorney's Office[s]?

A. No.

Q. Do they ever reach out to you after April the 1st — after they take the Shockley file in March and say, "Hey, I've got this special project I want you to help us out with"?

A. No.

Q. Before that date, had they ever asked you to help out with a special project?

A. No.

Q. Did he ever ask you or did anyone at his staff ever ask you to use your nursing expertise in any way to assist with a mental health court?

A. No.

Q. Have you ever heard of a mental health court?

A. I am aware of what a mental health court is, but I was never asked to help with one, no.

Q. Okay. Were you ever asked to help out with any driving while impaired court as far as a special project?

A. No, sir.

Q. Bottom line, after that file gets taken from you, do you have any work to do for the defendant?

A. No, sir.

In April 2016, the assistant district attorney who had contacted the SBI in 2015 contacted the SBI again, informing the SBI that Cindy Blitzer was attending

school during work hours. The SBI started a new investigation.

¶ 24    In July 2016, the SBI assigned Agent Whitley to the special investigations unit that was investigating whether Cindy Blitzer was "actually working the hours that she was being paid as an investigator in [District 9A]." As Agent Whitley explained, "[t]he investigation was to concentrate on either showing that Cindy Blitzer did work the hours she was being paid for or she didn't work the hours she was being paid for."

¶ 25    Agent Whitley contacted the Administrative Office of the Courts (AOC) to learn whether Cindy Blitzer was putting in hours worked or whether she had taken leave. AOC personnel informed Agent Whitley that Cindy Blitzer "was still entering her time . . . [generally for] eight hours a day, five days a week." AOC personnel also informed Agent Whitley that her hours had not been approved in the system.

¶ 26    Next, on or about 10 August 2016, Agent Whitley telephoned defendant to introduce himself, schedule an appointment, and inform him of the investigation and the nature of the investigation. When defendant returned Agent Whitley's call, Agent Whitley informed defendant of the call's purpose. Agent Whitley told defendant that the SBI "had received a complaint . . . that a member of [defendant's] staff, Cindy Blitzer, was not showing up to work [and] was being paid for hours that she was not working." Agent Whitley explained that he "would like to come [to defendant's office] and talk with him about it" and "conduct interviews with some of his staff." As a result of the call, Agent Whitley and defendant scheduled an appointment to meet on

6 September 2016 at the Person County District Attorney's Office.

¶ 27        On 15 August 2016, defendant called Stultz after hours and asked him to come to the Person County District Attorney's Office. At the office, defendant informed Stultz that he had received a phone call from an SBI agent and that there was a problem with Cindy Blitzer's hours. Stultz asked defendant who was releasing her logged time, and defendant answered, "You are." Stultz disagreed, reminding defendant that earlier that year defendant had said he would assign that duty to someone else. Stultz further stated his speculation that the problem may be that Cindy Blitzer's hours were not being released. After calling defendant's administrative assistant to ask who was supposed to be releasing Cindy Blitzer's time and hearing from her that this task was still assigned to him, Stultz told defendant that he could release the time if that was what defendant requested him to do. While logging into his computer, Stultz asked defendant whether Cindy Blitzer still worked for District 17A and had been working her hours. Defendant answered both questions in the affirmative. Based on his prior conversation with defendant in August 2015, Stultz understood that defendant had been supervising Cindy Blitzer since that conversation. Thus, Stultz released the time as directed by defendant.

¶ 28        Prior to his appointment with defendant, Agent Whitley spoke with two District 17A employees who had some information that they wanted to provide.

¶ 29        Agent Whitley's goal for his visit to the Person County District Attorney's

Office on 6 September 2016 was to interview people with whom Cindy Blitzer worked. He had mentally considered the process for his investigation. However, since it was early in the investigation, he had not developed a lead sheet detailing the intended investigative path. At that stage in the investigation, he did not have a preconceived notion of how the investigation would proceed. It could have gone many ways; "[i]t just depend[ed] on the information that [he] receive[d]."

On 6 September 2016, after arriving at the Person County District Attorney's Office, Agent Whitley interviewed defendant. Agent Whitley testified concerning his conversation with defendant about Cindy Blitzer's work as follows:

> Q.      . . . [D]id you ask him what type of work Cindy Blitzer was supposed to be doing for him?
>
> A.      I did.
>
> Q.      Was he able to tell you anything?
>
> A.      He told me that she worked on conflict cases. I believe he did reference the Shockley case when we met. He said that she also worked on special projects for him.
>
> Q.      When you say "for him," what do you mean by that?
>
> A.      Projects at his direction.
>
> Q.      Okay. That he had assigned to her?
>
> A.      Yes, sir.
>
> Q.      Did he provide you with a list of special projects that he had assigned to her?

A.      No, he didn't at that time. We did agree that he would compile a list of projects and forward that to me at a later date.

Q.      Okay. Well, let me go ahead and ask you: Did you ever get that list of projects that he worked on with her?

A.      No, sir.

Q.      Did he tell you if there were any other things that she was supposed to be working on?

A.      He did say that she was to help out in Caswell County and also she worked — her day-to-day work would be done in Rockingham County, and she was to do any other projects or work that Mr. Stultz wanted her to do from Caswell County and then any other projects or work that the Rockingham County office wanted her to do.

Q.      All right. Did he say to you that he ever talked to her about the number of hours that she was supposed to work?

A.      He did say that he had spoken with her and she knew to put in 40 hours of work each week.

Q.      Did you ask him if he had ever provided her with any equipment or anything like that through his office?

A.      Yes, I did. He said that she was provided with a desk at one time, but that desk was allocated to someone else at a certain point and she no longer had it. He said that she did not have a computer through his office. I believe I asked about cell phones, that type thing. I think he said that she did have a phone there at the office, but no cell phone was issued to her.

. . . .

A.      He told me at one point in the interview that she was a liaison to the Rockingham office for conflict cases.

. . . .

A.      He said that she was — also does special projects at his direction.

Q.      Again, at his direction?

A.      Yes, sir.

Q.      And did you ask for a list of those special projects?

A.      That was part of the list that we talked about towards the end of the interview, that I was expecting to meet with him again at some point to conduct another interview and receive this list of any projects or any work she could have done to give her credit for that.

Q.      And is that the list that you never got?

A.      Yes, sir.

. . . .

Q.      Did you ask the defendant for a list of people who would have had direct contact working with Cindy Blitzer?

A.      Yes, sir.

Q.      Was he able to provide you with that list?

A.      He did.

Q.     And when he provided you with that list, whose names were on it?

A.     He told me that he believed the employees that could possibly have [contact with her or] worked with her would have been . . . Stultz [and five other individuals, including defendant's administrative assistant].

Q.     Did you talk to those folks?

A.     Yes, sir. They were all interviewed.

. . . .

Q.     All right. During the course of this interview with the defendant, did you tell him that you were looking into whether or not Cindy was actually doing any work?

A.     That is exactly what I told him.

Q.     When you said that to him, did the defendant ever have any doubt or express to you that he didn't know if she was working or not?

A.     No, he did not say that. He led me to believe that she was working.

Q.     And, in fact, told you he was going to give you a list of the things that she was working on?

A.     Yes, sir.

. . . .

Q.     As a result of that information that you received from the defendant, did you have to go look into things that he had told you that ended up not being true?

A.     That is correct.

> Q.     What types of things did you have to go look into?
>
> A.     Well, that expanded the list of people that had to be interviewed because we, basically, had to interview the bulk of the employees from each county. . . . There were quite a few things we had to do.
>
> Q.     Okay.
>
> A.     The lead sheet would have looked a lot different had the information from [defendant] been different.

During this interview, Agent Whitley also sought defendant's permission to talk to his employees to collect information on whether Cindy Blitzer "was actually working for the money or not."

After his trip to the Person County District Attorney's Office and interview with defendant,[1] Agent Whitley "realized [that he] was going to have to meet with [defendant] again" and that "[i]t was going to take a while to complete this process." As a direct result of his interview with defendant, Agent Whitley had to track down other leads and had to interview the employees identified by defendant.

While at the Person County District Attorney's Office, Agent Whitley interviewed three District 9A employees, two of which had been named by defendant.

---

[1] Agent Whitley also prepared his investigation notes from his interview of defendant, which included a note that defendant "stated that Cindy Blitzer *is* a liaison to the Rockingham [County District Attorney's] Office for conflict cases," and defendant "stated that Cindy Blitzer also *does* special projects at his direction." (Emphases added.)

A few days later, Agent Whitley interviewed Stultz, who had been named by defendant. He also interviewed most if not all District 17A employees and interviewed nine more times the assistant district attorney who had initially contacted the SBI to inform the SBI that Cindy Blitzer was not working the hours she claimed. In the interviews, each of the employees identified by defendant as possibly having contact with or working with Cindy Blitzer indicated that he or she "had very minimal contact with Cindy [Blitzer]."

¶ 34       In addition to conducting interviews, the SBI submitted a public records request to the Rockingham County Sheriff's Office to obtain documents reflecting keycard activity by Cindy Blitzer. Such information was requested from other counties as well. The documents obtained from Rockingham County reflected that Cindy Blitzer's keycard was used on three days over the course of three months in the spring and summer of 2016.

¶ 35       In October 2016, the Blitzers called defendant and informed him that Cindy Blitzer wanted to resign. Defendant refused Cindy Blitzer's resignation and told her to keep entering hours as if she was working. Defendant knew that Cindy Blitzer had no work to do. Nevertheless, he suggested that Cindy Blitzer had been working on "special projects" and that she should tell investigators that. This flabbergasted the Blitzers because Cindy Blitzer had never worked on or heard anything about special projects prior to that conversation. She had only worked on the Shockley case.

¶ 36        Defendant later changed course and had his administrative assistant fire Cindy Blitzer a few days later.

¶ 37        The SBI continued to investigate whether Cindy Blitzer had been working while employed by defendant. In early March 2017, the SBI obtained a search warrant for and seized the computer in the Rockingham County District Attorney's Office that had been identified as Cindy Blitzer's computer. Shortly thereafter, Craig Blitzer resigned from his position as district attorney of Rockingham County.

¶ 38        Until May 2017, the Blitzers declined to submit themselves to interviews with the SBI. Cindy Blitzer stated during her interview on 12 May 2017 that she worked every hour that she logged until the Shockley case file was taken from her in March 2016 but did not work thereafter. Given her statement, the SBI decided not to forensically examine the computer that it had seized. The SBI also issued subpoenas to telephone carriers for phone numbers affiliated with the Blitzers to obtain phone records of incoming and outgoing calls.

¶ 39        Subsequently, the State criminally charged Craig Blitzer, and he pleaded guilty to one count of failure to discharge duties on 17 July 2017. The Blitzers also paid back the State $48,000. In October 2017, a grand jury indicted defendant by superseding indictment for conspiracy to commit obtaining property by false pretenses, obtaining property by false pretenses, aiding and abetting obtaining property by false pretenses, three counts of felony obstruction of justice, and willful

failure to discharge the duties of office.

¶ 40        Applying the standard of review for motions to dismiss for insufficiency of the evidence, we hold that the evidence taken in the light most favorable to the State was sufficient to support a determination that defendant knowingly and intentionally committed an act which obstructed, impeded, and hindered an investigation and public and legal justice. *See In re Kivett*, 309 N.C. at 670. "[A] reasonable inference of defendant's guilt may be drawn from the circumstances" presented as evidence before the jury. *Barnes*, 334 N.C. at 75.

¶ 41        The Court of Appeals concluded that when taking the evidence in the light most favorable to the State, the evidence presented at trial supported a determination that defendant's statement that Cindy Blitzer worked on special projects was false.[2] *Bradsher*, 275 N.C. App. at 724. However, unlike the Court of Appeals, we additionally hold that a reasonable jury could conclude that defendant's statement to Agent Whitley that Cindy Blitzer worked on conflict cases was false. Granted, Agent Whitley did not testify that he asked defendant if Cindy Blitzer was "currently" working on conflict cases. Yet, as set forth previously in more detail, there was ample evidence from which a reasonable jury could conclude that he asked defendant that question or questions to that effect and defendant knowingly and intentionally

[2] Neither party petitioned for this Court's review of this holding by the Court of Appeals.

answered falsely. For example, Agent Whitley explained to defendant that the investigation's purpose was to assess whether Cindy Blitzer "was being paid for hours that she was not working" and testified that defendant "told [him] that [Cindy Blitzer] worked on conflict cases . . . [and] also worked on special projects for him."

¶ 42        Second, a reasonable jury could conclude that defendant's false statements concerning Cindy Blitzer's work on conflict cases and special projects for defendant obstructed, impeded, and hindered the investigation and public and legal justice. While Agent Whitley had considered a mental process when he interviewed defendant, he testified that his steps and process changed as a result of his interview of defendant, partly because of defendant's false statements. He testified that "[i]t was going to take a while to complete this process." In fact, after interviewing defendant, the SBI interviewed most District 9A and District 17A employees, obtained subpoenas for phone records, submitted public records requests for keycard access data for multiple counties, and reviewed the documents obtained. The SBI also obtained a search warrant for and seized the computer in the Rockingham County District Attorney's Office that had been identified as Cindy Blitzer's computer. Further, after defendant's interview with Agent Whitley, Cindy Blitzer remained employed by defendant and paid by the State until her dismissal by defendant in October 2016. Craig Blitzer also remained as district attorney for Rockingham County until his resignation in March 2017 and did not plead guilty until July 2017.

¶ 43    While the dissent agrees that there is substantial evidence that defendant knowingly and intentionally made false statements with intent to deceive, the dissent contends the foregoing evidence previously summarized fails to satisfy the second element—of obstructing, impeding, or hindering public and legal justice. Yet, by focusing on whether there was "actual" obstruction of justice, the dissent substitutes its factual determination for that of the jury. To convince the dissent, direct, specific evidence is required. Further, to convince the dissent, the false statements must cause more than what would have occurred if defendant had not been interviewed or invoked his right to remain silent.

¶ 44    But this Court is not the fact-finder. We only consider whether there is "more than a scintilla of evidence" supporting the disputed element. *Powell*, 299 N.C. at 99. Is the evidence "existing and real, not just seeming or imaginary[?]" *Id.* Also, direct evidence is not required to survive a motion to dismiss for insufficiency of the evidence. *See e.g., State v. Stone*, 323 N.C. 447, 452 (1988) ("Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.").

¶ 45    Nor is it proper for this Court to contemplate what evidence "the State should have presented." *State v. Miller*, 363 N.C. 96, 100–01 (2009). The "proper application of the standard of review focuses our analysis on the evidence that the State did present in these highly fact-specific cases." *Id.* at 100. Thus, this Court has and must

assess the circumstantial evidence to determine "whether a reasonable inference of defendant's guilt may be drawn from the circumstances." *Barnes*, 334 N.C. at 75.

¶ 46 We conclude there is. There is more than a scintilla of evidence. There is sufficient evidence for the claim to go to "*the jury* to decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is *actually* guilty." *Barnes*, 334 N.C. at 75–76 (cleaned up) (emphasis added).

## IV.  Conclusion

¶ 47 Defendant could have declined to answer Agent Whitley's questions pursuant to his Fifth Amendment right to remain silent, but in deciding to answer, he could not knowingly and willfully answer with a falsehood. *Bryson v. United States*, 396 U.S. 64, 72 (1969). In this matter, a reasonable jury could conclude that defendant knowingly and intentionally committed an act, here making false statements to Agent Whitley, that obstructed, impeded, and hindered the investigation and public and legal justice. *See In re Kivett*, 309 N.C. at 670. Because we conclude that there is sufficient evidence to support the jury's verdict finding defendant guilty of felony obstruction of justice, we reverse the Court of Appeals' decision and reinstate the felony obstruction of justice conviction.

REVERSED.

Justice BERGER did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

Not every lie or misstatement to law enforcement constitutes an obstruction of justice. Holding as much would render one of the three elements of common law felonious obstruction of justice meaningless: the requirement that justice is, in fact, obstructed. *See State v. Ditenhafer* (*Ditenhafer I*), 373 N.C. 116, 128 (2019) (recognizing that the elements of common law felonious obstruction of justice are that: (1) the defendant unlawfully and willfully; (2) *obstructed justice*; (3) with deceit and intent to defraud).

And though on a motion to dismiss for insufficiency of the evidence, we must consider the evidence in the light most favorable to the State and allow it "every reasonable inference to be drawn therefrom," *State v. Ditenhafer* (*Ditenhafer II*), 376 N.C. 846, 2021-NCSC-19, ¶ 28 (quoting *State v. Powell*, 299 N.C. 95, 99 (1980)), the State must still introduce substantial evidence of each element of the crime, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]" *Ditenhafer II*, ¶ 28 (quoting *State v. Stone*, 323 N.C. 447, 451 (1988)). I do not agree with the majority that the State has met its burden here, specifically with respect to the requirement that it must introduce evidence that justice was actually obstructed.

As this Court has recognized, an obstruction of justice is "any act which prevents, obstructs, impedes or hinders public or legal justice." *Ditenhafer I*, 373 N.C. at 128 (quoting *In re Kivett,* 309 N.C. 635, 670 (1983)). In interpreting statutes that have codified similar versions of the common law crime of obstruction, courts in other

jurisdictions have emphasized that an obstruction only exists if there was a material impediment to the administration of justice.[1]

Mr. Bradsher was convicted of felony obstruction of justice on the basis of two statements he made to Agent Whitley during a 6 September 2016 interview that, taken in the light most favorable to the State, were false. I agree with the majority that a reasonable jury could conclude that Mr. Bradsher's statements during this interview that Cindy Blitzer worked on special projects and that she worked on conflict cases were false at the time they were made and were willfully made with the intent to deceive. The additional, essential question is whether those statements actually obstructed justice. *See, e.g., State v. Acklin*, No. COA21-385, 2022 WL 29887, *2 (N.C. Ct. App. Jan. 4, 2022) (unpublished) (vacating judgments where indictment "failed to allege an essential element of common law felony obstruction of justice: that

---

[1] *See, e.g., People v. Casler*, 2020 IL 125117, ¶¶ 41, 53 (reading a material impediment requirement into the state's obstruction statute and holding that the defendant's provision of a false name to law enforcement was not a material impediment); *State v. Wilson*, 101 Ohio Misc. 2d 43, 46 (Mun. 1999) (holding that the defendant's lie to law enforcement that a fourth individual was not in a car that was pulled over by police was not an obstruction under the state's "obstruction of official business" statute and explaining that a "false statement, even if made with the intent to hamper or impede, does not violate state law unless the officer is actually hampered in some substantial way").

Though these cases interpret statutes codifying the crime of obstruction rather than the common law crime, they provide helpful guidance. Similar to this Court's definition of obstruction of justice, for example, the statute at issue in *Wilson* prohibits activity that "hampers" or "impedes" public officials from carrying out their duties. Relying on the dictionary definitions of these terms, the court held that conduct, even if intended to hamper or impede, must actually result in the intended effect in some substantial way, as quoted above. *See Wilson*, 101 Ohio Misc. 2d at 46.

[d]efendant obstructed, prevented, impeded, or hindered justice"); *State v. Anderson*, No. COA15-269, 2015 WL 7288200, *6 (N.C. Ct. App. Nov. 17, 2015) (unpublished) ("[T]o convict a defendant of the common law offense of obstruction of justice, the State must prove that she 'had committed an act that prevented, obstructed, impeded, or hindered public or legal justice.' " (quoting *State v. Taylor*, 212 N.C. App. 238, 246, *disc. review denied*, 365 N.C. 342 (2011))).

¶ 52   In support of its position that Mr. Bradsher's false statements obstructed justice, the State presented the following evidence: (1) State Bureau of Investigation (SBI) investigator Agent Whitley's testimony that his lead sheet would have "looked a lot different had the information from Mr. Bradsher been different"[2]; (2) Agent Whitley's testimony that the information Mr. Bradsher provided "expanded the list of people that had to be interviewed because [he] . . . had to interview the bulk of the employees from each county"; and (3) Agent Whitley's testimony that he was going to have to interview Mr. Bradsher a second time and that "[i]t was going to take a while to complete th[e] process." The majority adds that Agent Whitley had "considered a mental process" that changed after his first interview with Mr. Bradsher, in part, based on defendant's false statements. The majority also points out that, as part of

---

[2] This testimony is not useful evidence of obstruction. It is manifest that had Mr. Bradsher provided different information, investigators would have prepared different plans in response. As explained below, the relevant question does not hinge on how the investigation might have been different had Mr. Bradsher given different information but rather how it would have differed had Mr. Bradsher never given any information at all.

its investigation, the SBI obtained subpoenas for phone records, submitted public records requests for keycard access data, and reviewed the documents it obtained.

¶ 53        This evidence fails to demonstrate how Mr. Bradsher's false statements—specifically that Ms. Blitzer worked on special projects and conflict cases—impacted the course of the investigation in a way that hindered or obstructed it or led it down a path it would not have otherwise taken if the interview were never conducted in the first place. A closer look at Agent Whitley's testimony further illustrates this deficiency. Agent Whitley testified that he had considered a mental process prior to interviewing Mr. Bradsher, but he clarified that "[i]t was so early in the investigation" that he did not believe he had yet developed a lead sheet. He further testified that he did not go into the interview with Mr. Bradsher "with a preconceived notion" about how long the investigation would take. These statements underscore the fact that the evidence presents no baseline from which to evaluate how and to what extent Mr. Bradsher's false statements impeded the investigation.

¶ 54        The Court of Appeals' decision in *State v. Cousin* further highlights this flaw in the State's evidence. In *Cousin,* the defendant was charged with obstruction of justice after providing law enforcement with eight written statements either identifying different individuals as the killer in a homicide case or placing different individuals at the scene. *See State v. Cousin*, 233 N.C. App. 523, 530–31 (2014). The Court of Appeals held that there was sufficient evidence of obstruction, including

because the detective "testified as to the significant burden imposed on the investigation," such as interviewing each individual the defendant identified and analyzing whether any of them were present at the scene of the crime. *Id.* at 531. *Cousin* is an example of a case in which law enforcement was manipulated into pursuing a line of investigation that it would not have pursued in the absence of the defendant's false statements.

¶ 55    The State's evidence here is not sufficiently specific to show a similar departure from the course the investigation would necessarily have taken otherwise. The closest it comes is in the form of Agent Whitley's testimony that Mr. Bradsher's false statements "expanded the list" of individuals who had to be interviewed as part of the investigation. If the false statements themselves necessitated the additional interviews, and these interviews would not have occurred had Mr. Bradsher either never been interviewed or invoked his right to remain silent, the evidence may have been sufficient to submit the charge to the jury. But Agent Whitley's testimony does not suggest as much, and it is entirely unclear how, taken alone, Mr. Bradsher's statements that Ms. Blitzer had worked on special projects and conflict cases required investigators "to interview the bulk of the employees from each county,"[3] and further,

---

[3] Agent Whitley also testified that Mr. Bradsher provided him with a list of individuals with whom Ms. Blitzer had worked directly. This list prompted Agent Whitley to follow up with those individuals. But, as he acknowledged, this list contained truthful information regarding employees who had come in direct contact with Ms. Blitzer. It therefore does not and cannot serve as the basis for an obstruction of justice charge.

that they would not have otherwise undertaken to conduct those interviews. The investigation here was to determine whether Ms. Blitzer was, in fact, working the hours for which she was being paid. All of the evidence about the steps taken during the investigation were steps that would be required to answer that question, with or without Mr. Bradsher's false statements that Ms. Blitzer worked on special projects and conflict cases.

¶ 56        Unlike *Cousin*, where the defendant's false statements implicating several individuals in a homicide required law enforcement to confirm the veracity of defendant's false charges, this case presents a situation where, taken in the light most favorable to the State, the defendant intentionally made misleading statements and investigators took additional steps to discover whether those statements were accurate. But a falsehood that merely requires additional investigation is not the touchstone of the inquiry regarding whether an obstruction or impediment existed. Rather, the inquiry turns on whether the content of the false statement caused investigators to be misdirected or delayed in a tangible way, for example, by being led down a path they would not have otherwise taken *but for* the false information. *See also State v. Skinner*, No. COA14-04, 2014 WL 6901847, *4 (N.C. Ct. App. Dec. 2, 2014) (unpublished) (holding that evidence that defendants' threats delayed a witness from notifying law enforcement personnel about the crimes committed against her for approximately eighteen hours constituted substantial evidence that

defendants committed an act that prevented, obstructed, impeded, or hindered public or legal justice, and, relying on Merriam-Webster's Collegiate Dictionary, defining "impede" as "to interfere with or slow the progress of," and defining "hinder" as "to make slow or difficult the progress of," "to hold back," or "to delay, impede, or prevent action"). Here, the State's evidence does not explain how Mr. Bradsher's statements forced investigators to pursue routes of inquiry that they would not have pursued had the statements never been made or otherwise delayed them in their efforts to determine whether Ms. Blitzer actually worked the hours for which she was paid. Mr. Bradsher's failure to confess the truth in his interview with Agent Whitley cannot, without more, be the sole basis of an obstruction of justice charge because he has the right to remain silent. Under common law, any lies he tells law enforcement are only criminal if they, in fact, obstruct justice. *See* Strong's N.C. Index 4th, Obstructing Justice § 1.

¶ 57        The majority asserts that this application of the State's burden would improperly place the Court in the role of a factfinder and require the Court to contemplate "what evidence the State should have presented." But requiring the State to present evidence of an essential element of the crime does not usurp the role of the jury—it simply requires of the State what it is legally obligated to do: present evidence that is "necessary to persuade a rational juror to accept a conclusion." *State v. Crockett*, 368 N.C. 717, 720 (2016). Further, requiring the State to introduce

evidence of each element of a crime does not inappropriately dictate what evidence the State *should have* presented, but rather what evidence it *must* present for the charge to be properly submitted to the jury.

¶ 58     Here, requiring the State introduce evidence—whether direct or circumstantial—of how Mr. Bradsher's conduct obstructed the investigation was necessary to prove one of the three elements of felony common law obstruction of justice. The problem is that the State introduced neither direct nor circumstantial evidence of an actual obstruction. Instead, it introduced testimony suggesting how the investigation might have been different had Mr. Bradsher told the truth from the outset. The majority, for example, points to the fact that Agent Whitley had to alter his preliminary plans for the investigation in response to Mr. Bradsher's statements, issue subpoenas for and seize Ms. Blitzer's work computer, and submit public records requests for keycard access data as evidence indicating obstruction. But these examples, like the rest of the evidence relied upon, illustrate activities that would have been required had Mr. Bradsher simply exercised his constitutional right to remain silent. Again, Mr. Bradsher's misstatements alone are not a crime, and the record is wholly devoid of evidence suggesting what role his specific falsehoods played in obstructing or impeding the investigation.

¶ 59     Finally, the majority seems to suggest that the State presented circumstantial evidence showing that Mr. Bradsher's falsehoods obstructed the investigation.

Circumstantial evidence is "proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant." *State v. Adcock*, 310 N.C. 1, 36 (1984). The evidence here fails to support any inferences whatsoever regarding how Mr. Bradsher's conduct obstructed justice. Mischaracterizing insufficient evidence as simply circumstantial reduces the State's well established burden of providing substantial evidence to nothing more than a burden in name only.

¶ 60        The State's evidence only details actions that investigators would have had to take anyway if Mr. Bradsher were never interviewed or had simply invoked his Fifth Amendment right to remain silent. Agent Whitley's testimony is not sufficiently specific to suggest otherwise. Tasks that would have been conducted regardless of whether misleading statements were made cannot amount to evidence of actual obstruction of justice. Thus, because the State did not introduce evidence that Mr. Bradsher's statements obstructed the investigation, I dissent from the Court's holding that there was substantial evidence of every element of common law felonious obstruction of justice, such that submitting the charge to the jury was proper. The State's evidence, at best, proved nothing more than that Mr. Bradsher lied during his interview with Agent Whitley. I would hold that the trial court erred in denying Mr. Bradsher's motion to dismiss for insufficient evidence as to the charge of felony obstruction of justice based on allegations of false statements he made to Agent Whitley because the State did not produce substantial evidence of actual obstruction.

Justice MORGAN joins in this dissenting opinion.